UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
(MONROE DIVISION)

| | |
|---|---|
| MICHAEL BARBREE, GLEN WALKER, and SONA ANDRESIAN, Derivatively on Behalf of CENTURYLINK, INC., | ) ) ) ) Index No: |
| Plaintiffs, | ) ) **VERIFIED SHAREHOLDER** ) **DERIVATIVE COMPLAINT** |
| vs. | ) ) ) |
| MARTHA H. BEJAR, VIRGINIA BOULET, PETER C. BROWN, KEVIN P. CHILTON, STEVEN T. CLONTZ, T. MICHAEL GLENN, W. BRUCE HANKS, MARY L. LANDRIEU, HARVEY P. PERRY, GLEN F. POST, III, MICHAEL J. ROBERTS, LAURIE A. SIEGEL, JEFFREY K. STOREY, R. STEWART EWING, JR., DAVID D. COLE, and SUNIT S. PATEL, | ) **DEMAND FOR JURY TRIAL** ) ) ) ) ) ) ) ) ) ) ) |
| Defendants, | ) ) ) |
| and, | ) ) |
| CENTURYLINK, INC., | ) ) |
| Nominal Defendant. | ) ) ) |

Plaintiffs Michael Barbree, Glen Walker and Sona Andresian ("Plaintiffs"), by and through their undersigned counsel, derivatively on behalf of Nominal Defendant CenturyLink, Inc. ("CenturyLink" or the "Company"), submit this Verified Shareholder Derivative Complaint (the "Complaint"). Plaintiffs' allegations are based upon their personal knowledge as to themselves and their own acts, and upon information and belief, developed from the investigation and analysis by Plaintiffs' counsel, including a review of publicly available information, including filings by CenturyLink with the U.S. Securities and Exchange Commission ("SEC"), press releases, news

reports, analyst reports, investor conference transcripts, publicly available filings in lawsuits, and matters of public record.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action brought in the right, and for the benefit, of CenturyLink against certain of its officers and directors seeking to remedy Defendants' breach of fiduciary duties, corporate waste, and unjust enrichment that occurred between January 1, 2013 and the present (the "Relevant Period") and have caused substantial harm to CenturyLink.

2.      CenturyLink provides various communications services to residential, business, wholesale and governmental customers in the United States. It operates through two segments: Business and Consumer. The Company offers broadband, Ethernet, colocation, video entertainment and satellite digital television services.

3.      Throughout the Relevant Period, Defendants (defined below) made materially false and/or misleading statements and/or failed to disclose material adverse facts about the Company's business, operations and compliance policies. Specifically, Defendants failed to disclose that: (a) CenturyLink's policies allowed its employees to add services or lines to accounts without customer permission, resulting in millions of dollars in unauthorized charges to CenturyLink customers; (b) CenturyLink's illicit practices were designed to allow CenturyLink to gain an advantage over its competitors and to increase profits; (c) CenturyLink's illicit conduct was likely to subject it to heightened regulatory scrutiny; and (d) CenturyLink's revenues were the product of illicit conduct and were unsustainable.

4.      As a result of the foregoing, Defendants' statements during the Relevant Period were false and misleading and/or lacked a reasonable basis.

5.      On June 16, 2017, *Bloomberg* published an article entitled "CenturyLink Is

2

Accused of Running a Wells Fargo-Like Scheme." The article reported on a lawsuit, recently filed in Arizona state superior court by former CenturyLink employee Heidi Heiser, alleging that Heiser "was fired for blowing the whistle on the telecommunications company's high-pressure sales culture that left customers paying millions of dollars for accounts they didn't request." The *Bloomberg* article stated that Heiser "was fired days after notifying Chief Executive Officer Glen Post of the alleged scheme during a companywide question-and-answer session held on an internal message board."

6.      As a result of this news, the price of CenturyLink shares dropped $1.23 per share to close at $25.72 per share on June 16, 2017, a decline of nearly 5% on volume of 43 million shares.

7.      Then, on June 19, 2017, *Bloomberg* reported that a consumer complaint had been filed against CenturyLink based on the whistleblower complaint alleging fraud, unfair competition and unjust enrichment.

8.      As a result of this news, CenturyLink share price declined another $0.36 per share to close at $25.36 per share on June 19, 2017.

9.      In accordance with Louisiana law, on September 27, 2017, Plaintiffs made a written demand (the "Demand") on CenturyLink's Board of Directors ("Board") to investigate and take the necessary legal action against those responsible for the damages the Company has suffered.

10.     On April 13, 2018, counsel for the Board notified Plaintiff that the Special Litigation Committee ("SLC") appointed by the Board to investigate the allegations made in the Demand had "determined that it is not in the best interest of CenturyLink to pursue litigation against any Directors, Officers, or employees of the company, or to act on any of the demands made on the company." Accordingly, the SLC rejected Plaintiffs' Demand.

11.     As explained in further detail below, the Board has acted on an uninformed basis and has unreasonably refused Plaintiffs' Demand.  In light of the Board's unreasonable refusal of Plaintiffs' Demand to investigate and remediate harms caused to the Company, Plaintiffs now rightfully brings this action to vindicate CenturyLink's rights against its wayward fiduciaries, and to hold those fiduciaries responsible for the damages they have caused to CenturyLink.

## JURSIDICTION AND VENUE

12.     This Court has jurisdiction over the claims asserted herein under 28 U.S.C. § 1332 because there is complete diversity among the parties and the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs.

13.     Venue is proper in this Court under 28 U.S.C. § 1931(b) because a substantial portion of the transactions and wrongs complained of herein occurred in this District, and by doing business here and engaging in numerous activities that had an effect in this District.

## PARTIES

A.     **Plaintiffs**

14.     *Plaintiff Michael Barbree* ("Plaintiff Barbree") is a current owner of CenturyLink stock and has held the stock during the time of Defendants' continuous illegal and wrongful course of conduct alleged herein.  Plaintiff Barbree will fairly and adequately represent the interests of the shareholders in enforcing the rights of the corporation.  Plaintiff Barbree is a citizen of the State of Georgia.

15.     *Plaintiff Glen Walker* ("Plaintiff Walker") is a current owner of CenturyLink stock and has held the stock during the time of Defendants' continuous illegal and wrongful course of conduct alleged herein.  Plaintiff Walker will fairly and adequately represent the interests of the shareholders in enforcing the rights of the corporation.  Plaintiff Walker is a citizen of the State of

Washington.

16.    ***Plaintiff Sona Andresian*** ("Plaintiff Andresian") is a current owner of CenturyLink stock and has held the stock during the time of Defendants' continuous illegal and wrongful course of conduct alleged herein.  Plaintiff Andresian will fairly and adequately represent the interests of the shareholders in enforcing the rights of the corporation.  Plaintiff Andresian is a citizen of the Commonwealth of Massachusetts.

**B.    Nominal Defendant**

17.    ***Nominal Defendant CenturyLink*** is a is a Louisiana corporation headquartered at 100 CenturyLink Drive, Monroe, Louisiana 71203.  CenturyLink's common stock trades on the NYSE under the symbol "CTL."

**C.    Director Defendants**

18.    ***Defendant Martha H. Bejar*** ("Bejar") has been a director of the Company since January 2016.  Bejar is a member of the Audit Committee and the Risk Evaluation Committee. Bejar received $255,804 in total compensation from CenturyLink in 2016, and $313,815 in total compensation from CenturyLink in 2017.  Defendant Bejar is a citizen of Florida.

19.    ***Defendant Virginia Boulet*** ("Boulet") has been a director of the Company since 1995.  Boulet is a member of the Human Resources and Compensation Committee and Chair of the Nominating and Corporate Governance Committee.  Boulet received $271,100 in total compensation from CenturyLink in 2014; $276,754 in total compensation from CenturyLink in 2015; $268,804 in total compensation from CenturyLink in 2016; and $296,815 in total compensation from CenturyLink in 2017.  During the Relevant Period, while in possession of material, non-public information, Boulet sold at least 6,207 personally held shares of CenturyLink stock at artificially inflated prices for proceeds of approximately $211,634.  Defendant Boulet is a

citizen of Louisiana.

20.    **Defendant Peter C. Brown** ("Brown") has been a director of the Company since 2009.   Brown is a member of the Audit Committee and a member of the Risk Evaluation Committee.  Brown received $256,100 in total compensation from CenturyLink in 2014; $251,391 in total compensation from CenturyLink in 2015; $255,804 in total compensation from CenturyLink in 2016; and $287,190 in total compensation from CenturyLink in 2017.  During the Relevant Period, while in possession of material, non-public information, Brown sold at least 12,724 personally held shares of CenturyLink stock at artificially inflated prices for proceeds of approximately $389,991.  Defendant Brown is a citizen of Missouri.

21.    **Defendant Kevin P. Chilton** ("Chilton") has been a director of CenturyLink since November 2017.  Prior to CenturyLink's merger with Level 3 in November 2017, he was a director of Level 3.  During the Relevant Period, Chilton was a member of the Company's Audit Committee and the Risk Evaluation Committee.  Chilton received $104,649 in total compensation from CenturyLink in 2017.  Chilton is a citizen of Colorado.

22.    **Defendant Steven T. Clontz** ("Clontz") has been a director of CenturyLink since November 2017.  Prior to CenturyLink's merger with Level 3 in November 2017, he was a director of Level 3.  During the Relevant Period, Clontz was a member of the Company's Nominating and Corporate Governance Committee.  Clontz received $95,649 in total compensation from CenturyLink in 2017. Clontz is a citizen of Florida.

23.    **Defendant T. Michael Glenn** ("Glenn") has been a director of CenturyLink since November 2017.  Prior to CenturyLink's merger with Level 3 in November 2017, he was a director of Level 3.  During the Relevant Period, Glenn was a member of the Company's Human Resources and Compensation Committee.  Glenn received $97,649 in total compensation from CenturyLink

in 2017. Glenn is a citizen of Tennessee.

24.    **Defendant W. Bruce Hanks** ("Hanks") has been a director of the Company since 1992. Hanks is the Chair of the Audit Committee and the Risk Evaluation Committee. Hanks received $295,347 in total compensation from CenturyLink in 2014; $282,905 in total compensation from CenturyLink in 2015; $288,632 in total compensation from CenturyLink in 2016; and $400,153 in total compensation from CenturyLink in 2017. Defendant Hanks is a citizen of Louisiana.

25.    **Defendant Mary L. Landrieu** ("Landrieu") has been a director of the Company since 2015. Landrieu is a member of the Nominating and Corporate Governance Committee. Landrieu received $235,804 in total compensation from CenturyLink in 2016, and $265,815 in total compensation from CenturyLink in 2017. Defendant Landrieu is a citizen of the District of Columbia.

26.    **Defendant Harvey P. Perry** ("Perry") has been a director of the Company since 1990. Perry is a member of the Risk Evaluation Committee. Perry received $354,263 in total compensation from CenturyLink in 2014; $341,266 in total compensation from CenturyLink in 2015; $347,609 in total compensation from CenturyLink in 2016; and $484,341 in total compensation from CenturyLink in 2017. During the Relevant Period, while in possession of material, non-public information, Perry sold at least 30,000 personally held shares of CenturyLink stock at artificially inflated prices for proceeds of approximately $945,000. Defendant Perry is a citizen of Louisiana.

27.    **Defendant Glen F. Post, III** ("Post") has been a director of the Company since 1985. Post founded the Company and is, and at all relevant times was, Chief Executive Officer ("CEO"), President and a director of CenturyLink. Post is a defendant in the Securities Class

Action.[1]  Post received $13,131,448 in total compensation from CenturyLink in 2014; $10,664,511 in total compensation from CenturyLink in 2015; $13,966,214 in total compensation from CenturyLink in 2016; and $14,715,560 in total compensation from CenturyLink in 2017.  Post is a citizen of Louisiana.

28.    **Defendant Michael J. Roberts** ("Roberts") has been a director of the Company since 2011.  Roberts is a member of the Human Resources and Compensation Committee.  Roberts received $242,100 in total compensation from CenturyLink in 2014; $239,391 in total compensation from CenturyLink in 2015; $241,804 in total compensation from CenturyLink in 2016; and $307,815 in total compensation from CenturyLink in 2017.  Defendant Roberts is a citizen of California.

29.    **Defendant Laurie A. Siegel** ("Siegel") has been a director of the Company since 2009.  Siegel is the Chair of the Human Resources and Compensation Committee.  Siegel received $262,850 in total compensation from CenturyLink in 2014; $262,696 in total compensation from CenturyLink in 2015; $264,554 in total compensation from CenturyLink in 2016; and $292,565 in total compensation from CenturyLink in 2017.  During the Relevant Period, while in possession of material, non-public information, Siegel sold at least 4,983 personally held shares of CenturyLink stock at artificially inflated prices for proceeds of approximately $134,286.  Defendant Siegel is a citizen of New Jersey.

30.    **Defendant Jeffrey K. Storey** ("Storey") is the Company's President and Chief Operating Officer and has been a director of CenturyLink since November 2017.  He is expected to become the Company's CEO effective May 23, 2018.   Prior to CenturyLink's merger with

---

[1]    *Craig v. CenturyLink, Inc., et al.*, Case No. 3:17-cv-01005-SMH-JPM (W.D. La.) (the "Securities Class Action").

Level 3 in November 2017, he was a director of Level 3. Storey received $10,944,929 in total compensation from CenturyLink in 2017. Storey is a citizen of Oklahoma.

**Officer Defendants**

31.    ***Defendant R. Stewart Ewing, Jr.*** ("Ewing") was the Company's Chief Financial Officer ("CFO") from 1989 to November 2017, Executive Vice President from 1999 to November 2017, and Assistant Secretary from 2009 to November 2017.    Ewing is a defendant in the Securities Class Action. Ewing received $3,842,520 in total compensation from CenturyLink in 2014; $2,804,629 in total compensation from CenturyLink in 2015; $3,414,376 in total compensation from CenturyLink in 2016; and $6,738,041 in total compensation from CenturyLink in 2017. During the Relevant Period, while in possession of material, non-public information, Ewing sold at least 65,600 personally held shares of CenturyLink stock at artificially inflated prices for proceeds of approximately $2,601,070. Ewing is a citizen of Louisiana.

32.    ***Defendant David D. Cole*** ("Cole") was the Company's Chief Accounting Officer ("CAO") and Executive Vice President – Controller and Operations Support from May 2013 to March 2018. Cole is a defendant in the Securities Class Action. Cole received $2,501,711 in total compensation from CenturyLink in 2014 and $1,829,010 in total compensation from CenturyLink in 2015. During the Relevant Period, while in possession of material, non-public information, Cole sold at least 37,525 personally held shares of CenturyLink stock at artificially inflated prices for proceeds of approximately $1,298,938. Cole is a citizen of Louisiana.

33.    ***Defendant Sunit S. Patel*** ("Patel") has been the Company's CFO and Executive Vice President since November 2017. Patel received $4,955,269 in total compensation from CenturyLink in 2017. Patel is a citizen of Colorado.

34.    Defendants Post, Ewing, Cole, Patel, Storey, Bejar, Boulet, Brown, Chilton, Clontz,

Glenn, Hanks, Landrieu, Perry, Roberts, and Siegel are sometimes referred to herein as the "Individual Defendants."

35.    Defendants Post, Storey, Bejar, Boulet, Brown, Chilton, Clontz, Glenn, Hanks, Landrieu, Perry, Roberts, and Siegel are sometimes referred to herein as the "Director Defendants."

36.    Defendants Bejar, Brown, Chilton, and Hanks are sometimes referred to herein as the "Audit Committee Defendants."

37.    Defendants Ewing, Cole, Boulet, Brown, Perry, and Siegel are sometimes referred to herein as the "Insider Selling Defendants."

### THE COMPANY'S CODE OF CONDUCT

38.    Pursuant to the Company's Code of Conduct,

**Fairness – The Golden Rule**

We will strive to:

- Exercise fairness in all dealings with customers.
- Treat business associates fairly in all transactions.
- Compensate and promote employees in an equitable manner.
- Be fair in efforts to meet and exceed the expectations of our shareholders.
- Treat others as we would like to be treated.

**Honesty and Integrity**

We will:

- Be truthful in all dealings with customers, employees, shareholders, business associates and the general public.
- Strive to conduct ourselves in a manner that will merit the respect of customers, employees, shareholders, business associates and the general public.

\*          \*          \*

**Who Is Required to Follow the Code?**

To achieve our financial and operational goals we must work

10

together as a team, across organizational and geographic boundaries, to meet the evolving needs of our customers. This same team-oriented approach applies to the pursuit of our corporate ethics and compliance goals. As such, this Code applies to all CenturyLink "team members," which includes *all CenturyLink employees, officers and members of the Board of Directors*.

All employees of CenturyLink, Inc., its subsidiaries, and majority-owned and controlled affiliates ("CenturyLink" or the "Company") are expected to carefully read and follow the policies in this Code. As used in this Code, "employees" means all individuals employed by the Company, whether on a regular or temporary basis, and whether on a full- or part-time basis. However, the Code does not change the terms of your employment with CenturyLink. [Emphasis added].

## SUBSTANTIVE ALLEGATIONS

39.    CenturyLink provides various communications services to residential, business, wholesale and governmental customers in the United States.  It operates through two segments: Business and Consumer.  The Company offers broadband, Ethernet, colocation, video entertainment and satellite digital television services.  The Company has over 5 million subscribers in a 37-state service area.

40.    On June 14, 2017, former CenturyLink employee Heidi Heiser ("Heiser") filed a whistleblower complaint in the Superior Court of Arizona for Maricopa County alleging that she was terminated for reporting to her supervisors and the CEO unlawful billing practices she observed and refused to take part in as a sales representative.  *Heiser v. CenturyLink, Inc.*, No. CV2017-008928 (Maricopa Cty. Super. Ct.).

41.    As explained in the Heiser complaint, the defendants maintained an incentive program(s) for their employees and agents which provided financial incentives to charge customers for services they did not order and/or to overcharge customers for services they did order.  Rather than uphold its duty to act in good faith and to ensure that it carefully charged

11

consumers only in the correct amounts, and for services that consumers authorized, the defendants shifted that burden to consumers and essentially dared them to locate the overcharges and then demand refunds.

42.    Fee generation is at the heart of the Company's business model.  At all relevant times, the Company sought to maximize the number of services which they could bill customers. The Company had a financial incentive to employ and continue such incentive programs, as it increased its revenues and profits.    At the same time, the Company's employment of such incentive programs harmed and injured consumers financially as they paid the charges that were improperly imposed in order to keep their accounts current.

43.    Ms. Heiser's allegations of what she observed, and what the CenturyLink corporate culture encouraged, are consistent with the experiences of thousands of consumers who have been misled by CenturyLink.

44.    A digital revolt against CenturyLink's fraud has been fomented by subscribers on social media and consumer watchdog websites.

45.    By way of example, the following consumer complaints are emblematic of CenturyLink's practices, as described in the Heiser complaint:



46.     These types of communications reporting overcharges and blaming consumers as opposed to CenturyLink taking responsibility for its billing practices and conduct, are similar to those posted online by other victims of the Company's practices, demonstrating a pattern and practice of the Company's violation of applicable consumer protection statutes, breach of customer contracts, and unjust enrichment at the expense of its customers. Rather than take care to ensure that they only billed consumers for amounts actually authorized and agreed to, as Defendants had a duty to do, Defendants attempt to shift the burden to the consumers to locate overcharges and then demand refunds within a short time frame. The amounts billed to each consumer each month are relatively small (less than $200) and therefore, the Company knows that certain consumers will have little time to actively monitor and immediately seek corrections when appropriate. The Company attempts to take advantage and exploit this. This type of catch-us-if-you-can policy was

unfair, deceptive and misleading. By way of example, an outraged subscriber posted the following communication on social media:



47.    Subscribers also post their written communications complaining of CenturyLink creating and billing for duplicate accounts.    Upon complaining, CenturyLink blamed the subscriber or implied that the subscriber was somehow under "fraud review." For example, one subscriber posted the following communication regarding CenturyLink's duplicative billing:



48.     Thousands of pages of consumer complaints, primarily focused on fraudulent billing practices, were lodged on Consumer Affairs' website. Many consumers state that the only reason they rated CenturyLink with "one star" was that "zero stars" is not an option. *See, e.g.*, https://www.consumeraffairs.com/cell_phones/centurylink.html.

49.     Upon information and belief, at least one State's Attorney General has investigated and entered into an "assurance of discontinuance" with CenturyLink which prohibits the conduct

15

described herein, however the conduct remains ongoing.

50.    The foregoing demonstrates that the Company has been engaged in far more than the odd mistake or rare miscommunication. Rather, it demonstrates that the Company acted intentionally to create a new profit center at the expense of unsuspecting consumers who had placed their trust in the Company to bill them accurately, honestly, and only withdraw from their bank accounts (many which were set up for electronic autopay deductions) the amounts actually due and agreed to.

51.    The offending and unlawful conduct by CenturyLink, throughout the United States, includes, but is not limited to:

- Billing consumers for phone lines or service items never requested by consumers;

- Billing consumers higher rates than the rates quoted during the sales calls;

- Billing consumers early termination fees when they cancelled the services due to higher rates;

- Billing consumers when they cancelled their service upon learning the quality was not as represented;

- Billing consumers for periods of service before the service was connected, for products never received, and failing to credit consumers for these erroneous charges;

- Billing consumers for services and products that the consumer never requested without giving the consumer a credit for these charges;

- Failing to process consumers' service cancellation requests in a timely manner and billing them for the period of the time the service remained connected following the request for cancellation, without providing a credit for this time period; and

- Charging consumers full price for leased modems that consumers returned to CenturyLink within the required timeframe, and then referring the consumers account to collections when the consumer refused to pay for the returned modem.

**A Whistleblower Exposes CenturyLink's Wells Fargo-Like Scheme**

52.     On Friday June 16, 2017, the truth concerning the Company's billing practices and their impact on the Company's financial condition began to be revealed.  On that day, *Bloomberg* published an article entitled *CenturyLink Is Accused of Running a Wells Fargo-Like Scheme*, which reported that Heidi Heiser, the former CenturyLink customer service and sales agent who alleged that she had been fired after publicly raising the issue of the Company's cramming business model to Defendant Post, had filed a whistleblower complaint against the Company.  As the article explained, Heiser's complaint revealed that the Company had engaged in a practice of charging customers for services they neither authorized nor requested.  The article further explained that, according to Heiser's complaint, to deal with customers complaining about having charges crammed onto their bills, CenturyLink customer service personnel were "directed 'to inform the complaining customer that CenturyLink's system indicated that the customer had approved the service,' . . . and as a result 'it was really the customer's word against CenturyLink.'"

53.     The article also explained that Heiser was fired two days after directly informing Defendant Post of these practices at an internal, Company-wide question-and-answer session.  In addition, the article connected the revelations to the recently-uncovered fraud at Wells Fargo, noting that "[t]he complaint likens what Heiser said CenturyLink sales agents did to the Wells Fargo scandal and estimated the alleged unauthorized fees amounted to 'many millions' of dollars."

54.     This disclosure partially corrected the Company's prior materially misleading

statements and omissions concerning CenturyLink's purportedly "customer first" sales practices, and also revealed that the Company's revenues had been inflated by cramming. Market reaction to the news was swift. As a result of these revelations, the Company's stock declined significantly, falling $1.23 per share – nearly 5% – on heavy volume, from the previous day's close of $26.95 to close at $25.72 on June 16, 2017.

55.     Analysts immediately reacted and reassessed their views of CenturyLink stock based on these revelations and connected the share price decline to the disclosures of the Company's misconduct contained in Heiser's lawsuit. For example, in a June 16, 2017 report, a CFRA analyst downgraded his rating on CenturyLink stock in direct reaction to these revelations, citing "increased risks" after reports of "a lawsuit filed by a former employee, accusing CTL of running a Wells Fargo like scheme."

56.     Analysts and market observers also recognized that the revelations in the Heiser lawsuit had wide-ranging impact on the Company's business. For example, on June 16, 2017, technology and communications publication CRN cited an industry professional whose company worked with CenturyLink who expressed shock at the practices revealed in the lawsuit. As reported in the article, this CenturyLink business partner "told CRN that he thought 'slamming,' or the illegal practice of switching a consumer's telephone service without authorization, was a thing of the past." The article further explained that these practices would likely impact future business, as CenturyLink's customers would raise questions about the Company's practices. Similarly, in a June 19, 2017 note, Morgan Stanley reported that the share price decline was triggered by "[n]ews that CenturyLink was facing a lawsuit alleging that the company overcharged customers in Arizona by adding additional services," stressing that additional information concerning the "scope of the alleged activity" and the "degree to which this appears to be an

18

isolated incident, or something with broader geographic and financial scope" would further impact their view of the Company's stock.

57.    The Company immediately scrambled to minimize the impact of the revelations in the *Bloomberg* article. In articles published on June 16, 2017 in technology and communications publications Ars Technica and CRN, CenturyLink claimed that the conduct alleged in Heiser's complaint was "completely inconsistent with our company policies, culture, and Unifying Principles, which include honesty and integrity," and pleaded ignorance on the part of the Company's senior executives, stating that "our leadership team was not aware of this matter until the lawsuit was filed."

58.    The next trading day, however, news worsened for the Company. On Monday, June 19, 2017, at 9:30 a.m., *Bloomberg* reported that a consumer class action lawsuit arising out of CenturyLink's billing misconduct had been filed in California the night before. The article explained that the lawsuit detailed how "Ms. Heiser's allegations of what she observed, and what CenturyLink corporate culture encouraged" were "consistent with the experiences of hundreds of thousands and potentially millions of consumers who have been defrauded by CenturyLink." The article noted that the "damages to consumers could range between $600 million and $12 billion, based on CenturyLink's 5.9 million subscribers." Shortly thereafter, numerous consumer class action lawsuits were filed in courts across the country.

59.    This disclosure further partially corrected the Company's prior materially misleading statements and omissions concerning CenturyLink's sales practices and also further revealed the scope of misconduct at CenturyLink and the degree to which the Company's revenues had been materially inflated by cramming.

60.    The market again reacted quickly. CenturyLink's shares dropped significantly by

19

a further $0.36, or 1.4%, to close at $25.36.  The price of CenturyLink's 7.60% Senior Notes similarly declined significantly, dropping nearly 6% from a June 16, 2017 closing price of $984.30 to close at $926.05 on June 19, 2017.

61.     Analysts continued to report on the revelations contained in the consumer lawsuits that were filed across the country.  For example, on June 26, 2017, an analyst from Barclays issued a report explaining the risks to CenturyLink in light of the revelations in the complaints filed in the weeks before and the Company's subsequent nearly 10% drop in share price and noted that these disclosures "could serve as an overhang for the shares for some time."

62.     Significantly, on June 22, 2017, the Company disclosed that Dean J. Douglas ("Douglas"), former President, Sales and Marketing – who had been the senior-most executive responsible for consumer sales and was just appointed by Post, CenturyLink's former CEO, in April 2017 to serve as a member of the combined Company's senior leadership team – would be leaving the Company as soon as the merger closed.   In doing so, Mr. Douglas forfeited more than $3 million in compensation in the form of time-based and performance-based restricted shares that had been granted him in February 2017 – a pay package that the Company confirmed in a Form 8-K filed on June 1, 2017, just three weeks prior to the abrupt leadership change.

**The Minnesota Attorney General Details CenturyLink's Fraudulent Sales Practices**

63.     Investors soon learned far more about the scope of CenturyLink's billing fraud.  On July 12, 2017, news reports disclosed that the Minnesota Attorney General filed suit against CenturyLink in Minnesota state court a year-long investigation that cited internal Company documents, emails, and call recordings revealing extensive detail as to how the Company fraudulently charged Minnesota consumers in violation of Minnesota's consumer protection laws.

64.     The Minnesota Attorney General's complaint provided significant and newly

disclosed detail concerning the means by which the Company cheated customers. Specifically, citing internal Company documents and non-public correspondence obtained through the Minnesota Attorney General's year-long investigation, the complaint detailed how CenturyLink's complex pricing systems, exception-laden promotional strategies, and myriad fees contributed to CenturyLink sales representatives systematically misquoting and misrepresenting prices to customers that the Company refused to honor. The complaint cited 35 specific examples of customers who were defrauded and provided significant detail as to how the Company's billing scheme was carried out. For example, the complaint cited an April 2015 email from a Company employee stating that she got "so many" complaints per day and that:

> maybe 1 out of 5 [customers] are quoted correctly or close enough. I have one today quoted $39 and its [actually] over $100 monthly. So I tend to get on the defensive for the customer at times because of the large amount that are misquoted. As in many cases, the customer calls in for several months and promised call backs, passed around, or cut off before going to the AG, PUC, FCC or BBB . . . .

65.    In a May 2015 conversation recorded by CenturyLink that was obtained and cited by the Minnesota Attorney General, another Company employee stated that "there are not enough people to do the work" of responding to the complaints, and that there was a "whole pile of Minnesota [complaints] to go through . . . they usually come in groups of 10."

66.    The lawsuit also revealed that the Company had systematically refused to honor the prices it quoted customers, and internally documented this fraudulent practice. Citing internal recordings and reviews of internal Company documents, the complaint detailed how CenturyLink refused to correct customers' improper and fraudulent bills. For example:

- A sales representative told a customer that "no one can get you that price" even though the Company's complaint file states that CenturyLink listened to a recording of the phone call and internally confirmed the "misquote" by the sales representative;

- A CenturyLink representative admitted to a customer that "you were

misquoted," but that "I can't give it [the quoted price] to you, no one can";

- A CenturyLink representative told a customer that its offers are "not binding";

- Another CenturyLink representative told a customer that the discounts that it had offered need not be honored because they are "a gift from us to you";

- After a CenturyLink customer called to complain that her bill had increased more than 50% the month after CenturyLink promised to change her rate, and cited the confirmation number she was given, the representative told her that CenturyLink can "give you all the confirmation numbers in the world" but that if CenturyLink "quotes you [a rate] not available it's going to get denied."

67.     The details provided in the Minnesota Attorney General's complaint also further revealed the financial impact of the Company's fraudulent practices. For example, in the 35 examples cited in the complaint, the fraudulent pricing added from $10 to over $100 increases in monthly charges, in many cases more than doubling customers' bills.  In a press conference held the same day the suit was filed, General Swanson said that, while unsure of the precise number of Minnesota customers impacted or the amount of restitution that would be required, she expected the numbers to be "very, very significant."

68.     The Minnesota Attorney General's complaint and General Swanson's press conference announcing the lawsuit were covered extensively in the press.  For example, a July 12, 2017 *Bloomberg* article reporting on the lawsuit revealed that the Minnesota Attorney General had been investigating CenturyLink for over a year.   The article explained that, contrary to CenturyLink's claims that it had cooperated in the investigation, the Company had in fact frustrated the Attorney General's inquiry by falsely claiming that certain customer call recordings did not exist.   In fact, General Swanson obtained them immediately as soon as her office subpoenaed a third-party CenturyLink vendor that had custody of the calls.   The report also

explained that the Company had also refused to provide basic pricing information, claiming doing so was "unduly burdensome." Similarly, the *Minnesota Star Tribune* confirmed CenturyLink attempted to conceal its unlawful practices, reporting that General Swanson said that CenturyLink was "lackluster" in responding to the State's investigation. According to General Swanson, in the course of the investigation, "[t]he company was contacted hundreds of times," and that "[t]his issue has been going on for a long, long time. We felt the need for judicial intervention."

69.     Analysts reacted sharply to the news. The same day, *Morningstar* published an analyst report in which it reported on the Minnesota Attorney General and consumer lawsuits. *Morningstar* analysts noted complaints of "similar overbilling practices in a number of other states, such as Oregon, Colorado, and Arizona," and explained that "it is likely that other states will follow suit in bringing legal actions against CenturyLink." On the sole basis of the revelations in the Minnesota Attorney General's complaint and the assessment that the problem was widespread, *Morningstar*'s slashed its fair value estimate for CenturyLink stock by over 6%.

70.     These disclosures further corrected Defendants' prior materially misleading statements and omissions concerning CenturyLink's sales practices. These disclosures also revealed that the Company's institutionalized cramming model went beyond adding unrequested services to customers' accounts and also included charging and misrepresenting fees, and systematically refusing to honor the prices offered to customers. Last, these revelations informed investors that the Company and its senior executives had knowledge of the extensive problems with CenturyLink's sales practices but concealed them from the state regulators.

71.     Once again, the market reacted severely to these revelations, with CenturyLink stock declining in a statistically significant manner, falling by $0.75 per share, or 3.23%, on extraordinarily high volume, to close at $22.50 on July 12, 2017, causing investors substantial

losses.

## The Company's Revenues Were Secretly Driven By An
## Institutionalized Company-Wide Sales Cramming Apparatus

72.    The Company's representations touting its "customer first" focus, superior customer service approach, and legal compliance were false. In reality, fraudulent sales practices were at the very core of the Company's business model.

73.    During the Relevant Period, the Company implemented a boiler-room sales apparatus in which intense pressure was exerted on sales personnel – including employees in so-called "customer service" positions – to bill for CenturyLink products and services without regard to whether customers wanted or requested them. This pressure took the form of impossibly high sales quotas, which employees were required to meet under threat of termination, as well as rewards and incentives for generating sales regardless of how they were obtained.  Under this constant pressure, customer service employees turned to deceptive practices to hit their numbers, including cramming, misquoting prices, and falsification of contracts. Indeed, some of the deceptive sales pitches CenturyLink used were developed by Company managers and discussed at monthly sales meetings.

74.    To ensure that the Company kept as much revenue from these improper charges as possible, CenturyLink established a "customer service" apparatus staffed by hundreds of call center representatives who were coached on how to "save" sales and given strict limits on the amount of "credits" they could issue to customers who had been improperly billed.  The Company knew, through direct communications from subordinates and regular reporting, that these rules and incentives led to rampant illegal cramming.

75.    These illegal and deceptive practices had a material, undisclosed effect on the Company's financial condition.   These practices resulted in CenturyLink potentially "over-

24

bill[ing] more than 3.5 million customers" — a number representing over half of CenturyLink's 5.9 million broadband subscribers and one-third of its 12 million wireline customers.

76.     This extraordinary overbilling rate did not happen by accident or escape the attention of the Company.  To the contrary, as set forth below, these practices were recorded in the Company's computer systems, regularly reported to the Company's executives and driven by a punitive sales quota system they approved.  In fact, CenturyLink itself has admitted that these deceptive sales practices originated in the offices and conference rooms at its corporate headquarters in Monroe, Louisiana.  In CenturyLink's words, its sales and billing "practices are run out of its headquarters" and "the consumer sales and billing channels at CenturyLink have all reported to common management and have all been subject to common sales and billing policies that apply across all consumer channels."  CenturyLink's lawyer explained to the Judicial Panel on Multidistrict Litigation that "the decision-makers are in Monroe," and that CenturyLink's call centers "just implement the policies from Louisiana."

### The Company's Senior Management Imposed "Ridiculous" Sales Quotas That Could Not Be Met Without Engaging In Deception

77.     CenturyLink's billing misconduct was driven by the sales quota system that CenturyLink put in place to meet the ambitious revenue targets that the Company promised Wall Street.  Defendants Post and Ewing were personally involved in approving revenue forecasts and sales quotas that contemplated and, in fact, necessitated improper sales practices.

78.     According to a former employee of CenturyLink[2], sales quotas were based on

_____

[2]     According to the Securities Class Action, Former Employee 1 ("FE-1") worked at CenturyLink for approximately 18 years as a Manager of Customer Care and Sales in the Southeastern United States until February 2018.   All references and information from former employees are taken from the Securities Class Action and are alleged herein under information and belief.

revenue targets that would be set by senior management during annual meetings. Once the revenue targets were determined, the marketing department would figure out which and how many products needed to be sold to hit those targets – *i.e.*, how many high-speed internet connections, Prism TV subscriptions, access lines, etc. Those figures would then be given to Linda Olsen[3], and she and other directors would divvy up the units by head count and assign quota numbers to each call center. According to FE-1, the quotas were based on the revenue projections that management had set – not on what the Company's sales force historically achieved. As FE-1 explained, "it was all revenue driven" and did not "make sense" based on prior sales. However, according to FE-1, CenturyLink's senior management had no interest in looking at any analytics that would take prior sales experience, or any other factors, into account. At CenturyLink, FE-1 said, the "number was the number."

79.     Former Employee No. 2 ("FE-2"), who worked in Financial Planning and Analysis as a Financial Analyst II from April 2013 through April 2016, confirmed that revenue projections would be presented to the executives at the Company, including Defendants Post, Ewing and Cole. The Company would then sign off on the projections, and those numbers became the working plan. FE-2, who worked on revenue forecasting and variance analyses for PrismTV, among other things, said that once the Company started receiving the actual numbers, a new analysis was run and the outlook would be updated every quarter, and the Company executive received these updates. According to FE-2, CenturyLink's revenue forecasts were often out of whack. As FE-2 explained, "A lot of times I'd get unit projections and would think, 'Are we really going to do this?' Just looking at what we had done [historically] it was always mind blowing. In a market where we'd

---

[3]     CenturyLink's Vice President of Consumer Contact Centers, who in turn reported to Defendant Post.

never sold over 1,700 units, all of a sudden we're going to push 2,500 units next month."

80.    According to the Securities Class Action, Former Employee No. 15 ("FE-15"), who worked as a Regional President in the Southern United States from 2009 through 2014, explained that CenturyLink's marketing strategy involved trying to compete with cable companies and other providers on price—but then charge fees, terms and charges to help the Company recover the revenue lost by keeping the price point low. FE-15 recalled that, in 2014, "there was a big push to keep the price point low but add fees," and FE-15 discussed this strategy in meetings with Company executives. FE-15 repeatedly voiced concerns about it but was told FE-15's approach was too naïve.

81.    According to the Securities Class Action, CenturyLink sales representatives stated that the sales quotas established by CenturyLink senior management were impossible to meet without committing fraud. For example, Former Employee No. 3 ("FE-3"), an inbound call center sales representative who worked at CenturyLink from April 2010 through December 2013, confirmed that the Company encouraged deceptive sales practices by having "ridiculous" sales quotas for the numerous products CenturyLink offered. As FE-3 explained, monthly quotas required customer service representatives to sell approximately 20 TV subscriptions, 30 internet subscriptions, 20 regular phone lines, and a certain number of long distance plans, as well as added features like LineGuard, Caller ID, three-way calling and @Ease. FE-3 said that the sales quotas were unreasonable and did not reflect what employees who were dealing honestly with customers could be expected to sell.

82.    According to the Securities Class Action, Former Employee No. 4 ("FE-4"), who worked as a CenturyLink Inbound Sales and Care Representative from March 2014 through January 2015, similarly confirmed that CenturyLink's monthly sales quotas were "insane" and

strictly enforced. Indeed, failure to hit the sales quotas for three months in a row was the reason FE-4 was terminated from CenturyLink. FE-4 explained that CenturyLink's quotas included selling approximately 30-40 phone lines and bundles per month; 25-35 internet subscriptions per month; and seven to 10 television subscriptions per month. FE-4 said that, for in-bound call representatives, these quotas were difficult to meet because most customers were calling in to complain about their bills and wanted to disconnect their service not purchase additional ones. However, according to FE-4, this is what CenturyLink expected inbound call representatives to do: sell additional products and services to complaining customers. FE-4 said that sales representatives were told that they had 10 minutes per call to figure out the customer's problem, resolve it, and then make a sale.

83.     Similarly, Former Employee No. 5 ("FE-5"), who worked as a Consumer and Business Sales Manager in Boise, Idaho from February 2009 through June 2016, said that CenturyLink sales employees repeatedly talked about how "crazy" the Company's quotas were. According to FE-5, the Company continued to steadily increase the sales goals throughout his tenure and, based on interactions with call center employees, it was clear that "their sales goals were so ridiculously high you had to cheat to get your numbers." Likewise, according to Former Employee No. 6 ("FE-6"), who worked as an Inbound Sales Representative from April through September 2015 and sold internet and cable services to residential customers, the sales quotas were "impossible to hit unless you were engaged in shady practices."

**CenturyLink Strictly Enforced Senior Management's Excessive Sales Quotas By
Disciplining and Terminating Employees Who Did Not Meet Them**

84.     CenturyLink's billing misconduct was perpetuated through the strict, punitive enforcement of the sales quotas senior management imposed. According to the Securities Class

Action, as confirmed by FE-1, FE-5, Former Employee No. 7 ("FE-7"),[4] and Former Employee No. 8 ("FE-8"),[5] CenturyLink's quotas for sales representatives were enforced as follows: In the first month an employee missed his or her sales goals, he or she would be put on a "documented discussion," a formal discussion with a supervisor that was the first disciplinary step. If the employee missed a sales goal for two months in a row, he or she would receive a written warning; if sales goals were missed for three months there was a formal warning of dismissal; and if goals were missed four consecutive months, the employee would be fired. As FE-5 explained, as the Company raised sales quotas, the monthly targets were harder to meet, which led to sales representatives to "store" any sales in excess of the monthly quota, and then post-date those sales so they would appear on the next month's statistics.

85.     CenturyLink senior management closely monitored compliance with sales quotas and discussed disciplining sales representatives who missed them every month. According to the Securities Class Action, as FE-8 explained, Olsen (CenturyLink's Director of Inbound Sales and Care), the relevant director and manager from each of CenturyLink's call centers, and an HR Business Partner would hold monthly calls to discuss employee sales performance and discipline—including how many representatives missed their targets, the status of the disciplinary action for those individuals, and what the next disciplinary step would be. In those meetings, Olsen and the HR Business Partners would review a spreadsheet that had a tab for each call center, and rows for each of the employees at each center. The spreadsheet rows would turn red if an employee did not hit their numbers. The excel sheet also included notes for the disciplinary actions

---

[4]     According to the Securities Class Action, FE-7 worked as a Customer Care & Sales Supervisor from 2010 to 2018 in the Midwestern United States.

[5]     FE-8 worked as a Lead HR Business Partner from 2012 until 2016.

taken for poor sales performance, as well as detailed information concerning the performance of each representative (including gross revenue, revenue per order, revenue per call, calls per hour, and revenue per hour). In fact, according to FE-8, most Company personnel – including Defendants Post and Ewing) – had access to a dashboard system that provided nearly up-to-the-minute data on sales and revenues, including employee-level information. The workbooks would reflect this effectively "real time" data and would also include notes on any disciplinary action taken for cramming.

86.     According to the Securities Class Action, as FE-3 explained, the high employee turnover rate at the Company illustrated that the quotas were unobtainable – about 15 to 30 new employees were brought in every other month, maybe a third would be with the Company three months after training. After three years, FE-3 was the eighth-most senior employee in a 60-employee call center. FE-3's own experience at CenturyLink illustrates just how unreasonable the quotas were. In 2012, FE-3 was named a Circle of Excellence honoree, meaning that her/his sales were in the top 1% of the Company and s/he had a picture taken with Defendant Post. However, the following year, when FE-3 was responsible for selling PrismTV, s/he was terminated for failing to meet CenturyLink's monthly quotas.

87.     Significantly, CenturyLink sales representatives were not the only employees accountable for meeting quotas – call center supervisors, managers and directors were as well. Former Employee No. 9 ("FE-9"), who worked at CenturyLink from 2002 through 2016, including as a Residential Customer Service Representative and as a National Order Help Desk ("NOHD") Representative in the Midwestern United States, explained that this environment not only drove unethical behavior, but a tendency for call center managers not to do anything about it. Although supervisors could terminate employees for unethical conduct, there was no reason to do so because

of the need to hit quotas.

88.     CenturyLink's sales goals were enforced even when, as inevitably occurred, doing so resulted in a majority of sales employees being disciplined. According to FE-8, for about seven months in a row in 2014, over half of all employees would have been written up for failing to meet the monthly quota. Similarly, FE-1 similarly estimated that about 70% to 80% of all sales agents could be in corrective action at one time.

89.     But at CenturyLink, the quotas were never adjusted. FE-7 said that when he questioned Olsen about strict enforcement of sales quotas, she responded: "That's our culture. If you don't get to 90% [of your quota], we're going to churn to the next person."

90.     The sales quotas imposed by CenturyLink, and the punitive manner in which they were enforced, contrasted sharply with the practices at the predecessor companies that CenturyLink acquired. For example, Former Employee No. 10 ("FE-10"), who began her/his career at Embarq and then worked at CenturyLink in the NOHD in the Southern United States from July 2009 through December 2016, said the sales culture changed dramatically after CenturyLink took over: "It became totally toxic." According to FE-10, "CenturyLink only cared about profits."

### CenturyLink Managers Instructed Employees on the Deceptive Sales Pitches that Sales Representatives Would Use to Cram

91.     The Company's management not only encouraged cramming through its aggressive quotas, but also specifically instructed sales representatives to use deceptive sales pitches and promotions, and even disciplined employees for failing to do so. According to the Securities Class Action, for example, according to FE-9, during every sales training s/he did at CenturyLink throughout out a 14-year career, the trainers would instruct representatives that they could quote a single price for internet service without disclosing underlying fees (such as the maintenance fee,

31

internet recovery fee, and other charges) that might be included, so long as the customer did not ask. These instructions were given at monthly sales meetings and sales strategy courses by Company trainers and would have been approved by Olsen, FE-9 said, because "everything" on training "had to go past her desk and be approved beforehand." According to FE-9, representatives were specifically told that if a customer "doesn't ask you don't have to tell them" that the single quoted price included other, optional products. FE-9 was even disciplined for not hitting quotas because s/he spent too much time, according to his superiors, telling customers what their actual charges would be.

92.     FE-5 likewise said that when s/he attended a training class, "the facilitators were straight up telling new hires just to tell people what the total price was and not what all the items were"—which FE-5 knew from her/his experience was in violation of both Company policy and federal regulations. According to the Securities Class Action, Former Employee No. 11 ("FE-11"), who worked as a Retention Specialist from 2006 through 2016 in the Southeastern United States, similarly confirmed that this practice – quoting one price but not disclosing that individual services included in the package were optional – would be encouraged by his/her call center manager at monthly meetings. According to FE-11, "That is cramming; it's highly illegal, and we were instructed to do it."

### CenturyLink Secretly Transformed Its "Customer Service" Department Into A Sales and Revenue Retention Operation

93.     CenturyLink's billing misconduct was also facilitated by CenturyLink's creation of a "customer service" department whose primary function was to sell services—not resolve complaints or provide customer service—as well as a complaint escalation department that was designed to minimize any refunds the Company owed customers.

94.     During the Relevant Period, CenturyLink employed approximately 250 to 450

"retention specialists" who were tasked with preventing customers who would complain about their bills from terminating their contracts with CenturyLink.   According to the Securities Class Action, Former Employee No. 12 ("FE-12"), who worked as a Retention Specialist from December 2015 through December 2017 in the Southeastern United States, explained that retention specialists' compensation was tied to the number of accounts they could "save" – i.e., prevent from disconnecting – and that retention specialists were instructed to "save by selling." FE-12 said that retention specialists would get a bonus if their retention rate was 85% or higher—meaning they were able to "save" 85% or more of all threatened disconnects.

95.    Even though retention specialists were responsible for addressing billing disputes and "saving" customer accounts, FE-12 said that retention specialists were limited in the amount of "credits," or refunds, they could offer customers to resolve billing disputes.  Specifically, credits for more than $50 needed a supervisor's approval, and the Company's computer systems made it physically impossible to give back credits for more than three months' worth of charges. Along similar lines, FE-10 reported that retention specialists were limited to giving out credits of around $3.50 to $5 per customer.   At the same time, FE-11 reported, retention specialists were also required to sell CenturyLink services, and had minimum sales quotas just like regular CenturyLink sales representatives.

96.    In addition to a team of "retention specialists," CenturyLink also created a National Order Help Desk, or NOHD, that handled customer "escalation" complaints – i.e., complaints in which a customer demands to "speak to a supervisor" – to account for the overflow of calls the Company received about improper bills and other complaints.  According to the Securities Class Action, FE-9, who worked at the NOHD from 2009 through 2015, explained that approximately 90% of the escalation calls s/he received were from customers complaining that they had fees and

charges added onto their accounts without their knowledge. According to FE-9, if the customer was able to prove he or she had been misquoted, NOHD employees offered to honor the misquoted price for the current month and the next month—but would not honor the price for a longer period than that.

97.    But CenturyLink made it difficult for customers to receive any refund at all. According to the Securities Class Action, Former Employee No. 13 ("FE-13"), who worked as a NOHD Consultant from 2010 until 2014 in the Western United States, stated CenturyLink made it nearly impossible for customers to successfully challenge the wrongful charges they incurred. FE-13 explained that it was the Company's policy that customers had the responsibility to confirm the accuracy of their bill, and if they did not verify the information provided during their price quote, that was their problem. According to the Securities Class Action, FE-13 explained that, because recordings of sales calls were only kept for about a month, it was virtually impossible for a customer to challenge a misquoted price or fraudulent bill. This is because under most promotions, the first month would be free, and customers would only receive their first "real" bill after that. According to FE-13, time was the biggest ally to the Company when it came to customer disputes. The Company put the burden on customers to prove the Company was wrong, but also implemented a policy of deleting the call recordings—the evidence that could show the customer had been misquoted—at around the same time the customer would learn he or she had been misled.

### CenturyLink's Enforcement of Unobtainable Sales Quotas Led to Rampant Cramming

98.    The combination of quotas set without regard to sales representatives' ability to meet them and the severity with they were enforced led to the expected result—customer service and sales representatives turned to deceptive sales practices.

99.    According to the Securities Class Action, FE-11 stated cramming was "happening

all the time, all day, every day," and that representatives who engaged in these practices included high sales performers who the Company named as "Circle of Excellence" honorees. According to the Securities Class Action, FE-13 said that, while s/he worked in complaint escalations, s/he received calls from customers complaining that their bills charged different rates than they were quoted – and from customers who had been wrongfully charged early termination fees – every single day. FE-13 said that s/he also received calls from customers who said that phone lines appeared on their bills that they had not requested once or twice per week. According to FE-13, there was a lot of cramming and unethical behavior, that cramming was widespread throughout the Company, and that it was encouraged by the Company's aggressive enforcement of sales quotas.

100.    According to the Securities Class Action, FE-7, who served as a Customer Care & Sales Supervisor, explained that there were "many, many instances of people doing things that we knew were unethical," including cramming. FE-7 explained that one frequently "slammed" service was the Company's @Ease computer protection package, which, at one point, cost $5 per month for a two-month promotional period and would then increase to $10 per month after the promotional period ended. According to FE-7, sales representatives would add @Ease service to customers' accounts without explaining that the promotional rate would expire or that they were adding the service at all, as sales of these products enabled representatives to meet their corrective action limit quota. As FE-7 explained, adding @Ease "counted as a sale and would make sure you weren't going to lose your job for missing your numbers." FE-4 similarly confirmed that adding CenturyLink's @Ease service to a customer's bill was a common, daily occurrence. Although CenturyLink did not explicitly instruct employees to add @Ease without the customer's knowledge, the culture at the Company encouraged this conduct. According to the Securities Class

Action, FE-4 stated that CenturyLink wanted employees to sell, and there were never any negative repercussions for adding services like @Ease to customer accounts.

101.    According to the Securities Class Action, Former CenturyLink employees explained that the same "cramming" practices used in residential sales were also employed when selling to small-medium business customers.    According to the Securities Class Action, Former Employee No. 14 ("FE-14"), who began as a sales representative on the residential side in March 2014 but was then promoted to the small business and enterprise units before leaving the Company in October 2017, explained that sales representatives who "crammed" customers were the best performers, and thus were promoted to the business side.  After being promoted, FE-14 explained, those same individuals would continue the same practices that led to their promotion in the first place.

102.    According to the Securities Class Action, FE-14 described a typical tactic: a representative selling CenturyLink's small business services would tell a customer the options, provide a quote, and tell the customer to call back when the customer was ready to complete the order.  However, the sales agent would then secretly place the order at that time and label the sale a "self-install." A "self-install" was selected to ensure that a technician would not arrive at the customer's business and alert the customer to the fact that service (from CenturyLink's standpoint) had, in fact, been ordered.  FE-14 repeatedly received phone calls from customers looking to complete an order and would pull their information up on the Company's computer system and see that the order had in fact been placed during the original phone call.  FE-14 reported instances of orders already having been placed, and was told management would investigate the problem, but did not see any evidence that anyone was ever disciplined for this practice.

103.    The financial impact of these cramming practices was highly material.  Thousands

of consumer complaints, including those obtained in the Minnesota Attorney General's investigation, reveal that CenturyLink customers—including elderly consumers living on fixed incomes—were routinely overbilled hundreds of dollars each, and that the Company institutionalized a policy of refusing to honor confirmed, quoted prices. For example:

- L.F. switched to CenturyLink to save money, but her/his first bill was more than double the price CenturyLink had quoted. L.F. contacted CenturyLink and was told that s/he would receive credits for the overcharge, but the next month's bill was even higher. L.F. called CenturyLink in November 2013 requesting to disconnect his/her service but continued to receive bills despite calling the company a second time in November, three times in January 2014, and two more times in February 2014. CenturyLink refused to cancel L.F.'s bill of $412.31 for services that L.F. sought to disconnect months before.

- J.F., a retired engineer, was offered internet service for a base rate of $19.99 per month, but received a bill for $367.33, including internet service for a base rate of $71. CenturyLink told J.F. that the Company had "verified" the $19.99 offer but would not honor the promised rate.

- S.H., a 70-year-old former director of a non-profit organization, purchased a CenturyLink package that the Company said would cost approximately $54 per month. S.H. was charged $103.87 and after calling CenturyLink, was promised that the bill would be fixed—but the Company charged $76.46 and $77.96 the following two months.

- When S.J. signed up for CenturyLink's internet service in October 2016, she was told by a CenturyLink representative that she could cancel without paying an early termination fee. A few months later, when S.J. tried to cancel, she was told that she would have to pay a $200 fee. The company refused to honor its promise to cancel her service for no charge and instead offered to reduce the $200 cancellation fee to $146.20.

- K.T., a 76-year-old retiree, was promised a rate of $62.14 and $40.91 for the first and second months and then $85.92 per month for the rest of the year—but he was actually charged $172.24 the first month, or more than $100 above

the promised price. CenturyLink then falsely promised to fix his bill.

- M.H., who is 81 years old and lives on a budget, agreed to keep her service after CenturyLink promised her the same rate for another year—but CenturyLink increased her bill and then charged her a series of changing rates. CenturyLink then refused to give her the rate she was promised, claiming that there were no promotion that could give her the promised price, and then threatened to charge her a $200 cancellation penalty if she terminated her service—even though the CenturyLink agent she spoke to confirmed that the Company had lied to her.

104.    The above examples illustrate the financial impact of CenturyLink's cramming practices.

### CenturyLink Documented Instances of Cramming and Reported Them to the Executive Officers at the Company

105.    In all events, CenturyLink's senior management were directly informed of the Company's cramming practices, and the rampant billing misconduct that was at the core of the consumer and small business sales strategy.

106.    To start, the Company's improper sales practices were documented and monitored through the Company's "quality assurance" program and reported to managers through a "coaching" process that focused on ensuring sales and rarely led to discipline for billing misconduct. For example, NOHD employees were instructed to record and "coach" sales representatives about mishandled calls and, in doing so, routinely documented instances of cramming and other improper sales practices in the Company's computer systems and communicated the violations to the representatives' supervisors. According to the Securities Class Action, FE-9 explained that NOHD representatives were to investigate the reasons behind a customer's complaint and document them in a report in the Company's Order Quality Management, or OQM, system. According to the Securities Class Action, FE-9 stated that the

38

NOHD representatives would document cramming incidents in the OQM, which included various "codes" for violations of Company policy. These codes were listed in a drop-down menu and included, for example, misquoting a price, making improper or inaccurate notes in a customer's call history, or placing an "unauthorized service on account" – the Company's code for "cramming." According to the Securities Class Action, FE-10 said that, at one point, s/he was filling out a form for reports addressing unauthorized charges at least once a day and, at minimum, at least once or twice per week. As both FE-9 and FE-10 reported, OQM reports were automatically sent to the sales representative's supervisor, who was then responsible for "coaching" the representative and addressing the violation.

107.   But because supervisors' compensation depended on meeting quotas, the corrective "coaching" or discipline rarely occurred. According to FE-9, although sales representatives were ostensibly supposed to have a quality rating of over 93% (meaning they could not have more than 7 OQM findings for every 100 calls), FE-9 knew of representatives who were reported for cramming every day who were never reprimanded. As FE-9 explained, "How many times do I have to ding this person? How do you keep them and not fire them? It was because just their immediate supervisor was reviewing them. The supervisor would discuss the OQMs with them and could [fire] them or discipline them. But if I'm a supervisor why would I do that if they're selling all that stuff?"

108.   According to the Securities Class Action, FE-7 similarly reported that, despite extensive documented instances of cramming, responsible employees were rarely disciplined. FE-7 explained that when investigating complaints of cramming, s/he would pull the recording (if one existed) of the phone call, allow the representative to listen to it and allow the representative to explain the other side of the story, and then formulate a recommendation for FE-7's supervisor,

the Call Center Director, who would then discuss the issue with Human Resources. FE-7 stated that there were a lot of sales representatives who were repeat offenders and had multiple documented incidents of unethical sales conduct but were not disciplined. FE-7 recalled one sales representative who had 13 documented cases of unethical sales behavior that were logged in the Company's coaching database but was never disciplined. FE-7 said that, because s/he had access to the Company's coaching database, s/he could see complaints s/he had made about certain sales representatives did not result in any corrective action. When s/he failed to see any corrective action measures taken, FE-7 would call the Company's integrity or "tips" line, which would assign a confirmation number to the complaint that could be used to check on any follow-up investigation. In numerous cases, FE-7 would report instances of cramming, and go back and check the status of the complaints s/he reported. None of those complaints were ever updated to reflect they had been addressed.

109.     The sales practices used at the Company's call centers were also documented and reviewed by a separate Quality Assurance department. According to the Securities Class Action, Former Employee No. 16 ("FE-16"), who worked as CenturyLink's Manager of Customer Experience from April 2011 to July 2015, stated the Company's Quality Assurance team would review four calls made by each sales representative every month, score those calls, and provide feedback in reports in a system called Q-FINITY. The calls would be scored by a team of approximately 88 workers (66 contracted by an overseas outside vendor and 22 located in the U.S.) on about 26 or 27 different metrics or questions, such as whether the representative reviewed what the customer currently had in service, offered the customer other products, and quoted the correct rates and internet speed. Once a call was reviewed and scored, the representative's supervisor would be notified by email, and could then pull up the report on the Q-FINITY system. Any team

leader, director or vice president also had access to the QA call scores, and every month FE-16's team would compile a report that was sent to team leaders, directors, VPs, and regional VPs analyzing trends and other metrics from the scoring data.

110.    Two circumstances prevented this QA review from providing an effective check on inappropriate sales behavior. First, according to the Securities Class Action, FE-16 stated that the review and enforcement of the QA findings was the responsibility of call center supervisors who were not incentivized to discipline employees.  As FE-16 explained, although the QA results were at one time factored into compensation for call center managers and supervisors, the QA metric was removed from monthly bonus compensation in 2014 for all call center director-level employees and below—a decision that was implemented by Olsen and approved by Senior Vice President Consumer Sales & Care, Kathy Victory.  As a result, according to FE-16, "supervisors were 100% not incentivized for QA."  Second, the QA department was effectively eliminated in February 2015 for cost reasons, and the responsibility for QA was given to call center supervisors. FE-16 had "grave concerns" over the elimination of the QA department, which s/he expressed to Olsen and Victory, given "how valuable our practice was in calling out inappropriate behaviors and changing behaviors at the call centers."  FE-16 explained that moving the QA process in-house and having supervisors review calls was not effective because poor reviews made the supervisors look bad.  As a result, after the QA department was eliminated, "supervisors were not conducting reviews at all" and "were just checking the boxes they needed to."

111.    Despite the fact that CenturyLink employees who routinely witnessed cramming and other deceptive sales practices reported that this misconduct was rarely punished, the conduct was so widespread that – even though "rarely" addressed – the Company's human resources department still disciplined employees for cramming on a routine basis.  According to the

41

Securities Class Action, FE-17, who was Director of Human Resources for consumer and small business sales from April 2011 until December 2016 and oversaw over 8,000 employees, said her/his team received complaints from call center sales employees about the unreasonableness of sales goals and would get exit survey data from employees who left the Company who said they were not being paid enough to be put under the kind of pressure they were subjected to. According to the Securities Class Action, FE-17 said that CenturyLink employees were frequently terminated for cramming accounts, and those employees would tell Company investigators that they crammed customer accounts because they were under pressure to make sales and felt they had to do so or would risk losing their jobs. FE-17 said the cramming issues were documented in exit interviews, and that these facts were shared with call center directors, as well as FE-17's supervisor, Vice President of Human Resources Kathy Flynn. According to the Securities Class Action, Former Employee No. 20 ("FE-20"), who worked as an HR Business Partner from 1995 through April 2015, similarly confirmed that cramming and unethical sales behavior was always an issue at CenturyLink, employee turnover was horrible, and the major reason people would leave was due to the fact that sales goals were impossible to meet—a concern that was expressed to CenturyLink's HR department during exit interviews and other separation processes.

112.    The complaints concerning customer cramming and other deceptive sales practices were also regularly reported to executive officers of the Company in monthly reports generated by the Company's Executive & Regulatory Services division. According to the Securities Class Action, Former Employee No. 18 ("FE-18") worked as one of three managers of that division from 2009 through March 2014 and was responsible for handling complaints from the FCC, state attorneys general and the Better Business Bureau, as well as "executive complaints," or formal written complaints to Post and other "C-level" executives. According to the Securities Class

Action, FE-18 dealt with hundreds of complaints per month, and the majority of those were customers who said they had been defrauded through cramming or otherwise improperly billed. Of the cramming complaints FE-18's team reviewed, about half were substantiated and "did, in fact, happen like the customer said it did." According to the Securities Class Action, FE-18 explained that top performing sales employees and Circle of Excellence honorees were frequently identified as repeat offenders – i.e., were identified in customer complaints for cramming – and that FE-18 and other managers in her/his division repeatedly told Victory that this was the case. According to the Securities Class Action, Former Employee No. 19 ("FE-19"), who worked as a Manager of Executive Complaints from 2009 through June 2013, similarly reported that top sales performers were often the worst offenders regarding cramming, a fact that FE-19 team looked into and confirmed multiple times.

113.    FE-18's team emailed monthly reports to CenturyLink's senior leadership – reporting on the number, types and categories of complaints from the FCC, state agencies, the BBB and direct customer escalations. According to the Securities Class Action, FE-18 stated the majority of the complaints were billing related, and the reports specifically identified "slamming/cramming" as a complaint category. As FE-18 explained, the data on these complaints were discussed with CenturyLink senior management on conference calls focused on operations reviews. FE-16, who was involved in this monthly reporting, confirmed that billing complaints were always one of the key things the reports would analyze. According to FE-16, the "complaint that always stood out was misrepresenting prices. We always had those issues."

114.    FE-19 likewise confirmed that Defendant Post was sent and reviewed monthly reports concerning the cramming complaints that CenturyLink received, and those reports included specific category of complaints for cramming—a "very common and widespread" issue cited by

customers.  According to FE-19, after reviewing the reports, Defendant Post would often complain to FE-19 that the number of complaints was inaccurate and too high.  As FE-19 explained, the numbers reported to senior management were accurate – and FE-19 would confirm the accuracy of the reports and the team's process to Defendant Post who never provided any justification for believing the numbers were wrong.  According to FE-19, this was because Defendant Post knew the numbers were accurate and only claimed they were not "so [he] didn't have to deal with it."

115.    According to the Securities Class Action, FE-19's team was responsible for investigating customer complaints submitted by regulatory bodies like state Attorneys General, public utility commissions, and the FCC, and would review an average of 4,000 complaints per month, half of which were related to billing issues and cramming, as well as customer escalation complaints about cramming addressed to Defendant Post.  Defendant Post would often ask FE-19's team to look into complaints addressed to him, resolve them, and report back.  When FE-19 would report back to Defendant Post about the resolution, he would often complain about it— typically, according to FE-19, Defendant Post would say that FE-19's team had given the customer too much compensation.

116.    According to the Securities Class Action, FE-19 explained that, despite the substantial number of complaints and evidence of cramming – which was clearly occurring in every state in which CenturyLink did business – CenturyLink's senior leadership refused to meaningfully address the problem.  FE-19 said that FE-19's team would provide recommendations about what could be done to reduce cramming to Defendant Post, but he never acted on those recommendations.

117.    According to FE-19, this was because Defendant Post and other senior executives were not willing to lose revenues in order to reduce the number of complaints.  To illustrate, FE-

19 described CenturyLink's response to at least four state Attorney General civil investigative demands issued between 2009 and 2013 in which 600 out of 700 consumer complaints (or 83%) were substantiated by FE-19's team. Despite repeated civil investigative demands, CenturyLink refused to change its practices. According to FE-19, CenturyLink senior leadership simply did not take the Attorney General investigations seriously—indeed, FE-19 reported that senior management would rather "just pay the fines" than "kowtow" to state Attorneys General.

### CenturyLink's Senior Management Recognized the Unsustainability of the Company's Boiler Room Sales Practices and Attempted to Address Them

118.  By the beginning of the Relevant Period, the Company's improper sales practices became a central focus of the Company. In April 2014, according to the Securities Class Action, FE-5 alerted both her/his manager, Northwest Region Vice President Brian Stading, of the cramming issues s/he encountered. Specifically, on or around April 23-27, 2014 at the Company's "Circle of Excellence" event at the Breakers Hotel in Palm Beach, Florida, Stading introduced FE-5 to G. Clay Bailey ("Bailey"), the Company's former Senior Vice President and Treasurer, specifically so that FE-5 could address the constant and rampant cramming and misquoting problems s/he encountered to CenturyLink's most senior-level managers. In that discussion, FE-5 explained the complaints and issues with cramming s/he was experiencing. In response, Defendant Bailey acknowledged these cramming issues were occurring, and told Stading and FE-5 that "We've got to do something about our call centers."

119.  According to the Securities Class Action, after this discussion, Defendant Post sent out a corporate-wide email saying that the Company was creating a new position for Bailey on business ethics and how the Company deals with customers. After receiving the email announcing the new position, FE-5 sent Bailey an email reminding him of their conversation at the Breakers and asked to be a part of the team that was going to be fixing the call center issues.

120.     At around the same time, CenturyLink's senior management began to develop a new behavioral coaching model for its sales employees—another action that was prompted by the complaints the Company's cramming and deceptive practices had generated.  In 2014, according to the Securities Class Action, FE-17's team developed a new way to measure employee performance. Instead of judging employees on numerous metrics, which FE-17 said were impossible to meet, FE-17's team developed a new "behavioral coaching" model which judged employees on three overall criteria: how many customers did the employee help, did the employee resolve all issues the customer presented, and did they provide good customer service.  Flynn was convinced to adopt this change, and supervisors were trained to provide behavioral coaching (rather than focusing on metrics) using this criteria.  According to FE-17, when this new system was rolled out, it was initially well received. Defendant Post recognized Vice President of Human Resources Kathy Flynn for her work on the project, and employees provided positive feedback, boosting morale.   According to FE-17, the number of complaints from customers declined significantly, as did terminations for unethical behavior.

121.     However, after only a few months, CenturyLink's sales numbers took a downturn. According to FE-17, after the decline in sales, the Company's senior management reverted back to the old metrics system almost immediately because CenturyLink senior management could not tolerate any drop in sales.   Numerous other former employees confirmed the change in the disciplinary model, and the impact on sales.  For example, according to the Securities Class Action, FE-20 confirmed that the switch to behavioral coaching model was done, in part, as an attempt to lower the number of cramming incidents.  FE-20 described how employees who were determined, through an HR investigation, to have committed unethical sales behavior would say that it was something they felt they had to do in order to keep their jobs—and the effort to reduce this pressure

motivated the switch to behavioral coaching. According to FE-20, "Recruiting couldn't even keep the turnover. We were having so much discipline and so many investigations, and we were hearing in the exit interviews that it was because of the sales quotas," so CenturyLink had to stop enforcing them so strictly.

122.    Similarly, according to the Securities Class Action, FE-1 recalled a change in corrective action policy around 2014 whereby sales representatives received behavioral coaching while supervisors were to be held accountable for sales numbers. According to FE-1, after this change was adopted, sales fell off "very quickly," and thereafter the Company went back to the old model of enforcing quotas at the sales representative level. Similarly, FE-8 recalled a change to a behavioral coaching model in 2014-2015 which was less focused on a metrics-heavy scorecard. Like FE-17, FE-8 said that while the change was initially well received, it immediately led to a significant drop in sales. As FE-8 reported, "I remember results dropping drastically when people were no longer being managed to a number."

123.    Rather than reveal the truth – that the Company was desperately trying to address the deceptive company-wide sales and marketing practices at the Company's call centers that had secretly driven a material portion of the Company's reported results – CenturyLink concocted a false story to explain the revenue declines. For example, in announcing CenturyLink's 2014 fourth quarter results on February 11, 2015, Defendant Post blamed the "weaker" revenues on a recent reorganizational alignment and warned that this realignment could "result in some additional negative impact on our sales momentum in the first half of 2015"—an explanation that provided cover for the sales dip associated with the Company's relaxing of the strict quota-enforcement system, and the time needed to ramp sales back up again after the behavioral coaching model was aborted. When the Company's first quarter results and CenturyLink's consumer segment missed

revenue estimates, the Company again blamed the sales alignment, and again, analysts credited the Company's explanations. For example, UBS noted that consumer segment revenues were approximately $8 million below estimates while Oppenheimer—which also expected better results—noted "[w]eakish [f]undamentals" in the consumer segment. No analyst suspected that these results were driven by CenturyLink's attempt to remedy cramming.

124.    Just a month later, on June 2, 2015, and just three months after the Company announced that Karen Puckett, CenturyLink's former Global Head of Sales, had been promoted to the head of global sales, CenturyLink announced that Puckett was leaving the Company. No explanation was given for her departure. A press release announcing the move quoted Puckett as saying that she was "looking forward to spending more time with my family and considering other leadership opportunities that allow me to continue to have a significant impact."

125.    Shortly thereafter, CenturyLink's return to the metrics-based system and strict enforcement of sales quotas began to take hold. For example, during the Company's third quarter 2015 earnings call on November 4, 2015, Defendant Post highlighted a "solid quarter" in the consumer segment, with revenues growing $18 million year-over-year. Defendant Post did not disclose the true driver of this sales growth—i.e., the Company's undisclosed cramming practices—but rather credited CenturyLink's strategy of "attracting more high-value customers" and pursuing "higher value bundled sales and select pricing increases."

126.    By year-end, the return of the Company's prior sales practices had taken effect, and the Company was able to again report favorable results to Wall Street. For example, in announcing year-end results on February 10, 2016, Defendant Post attributed the reported rebound in revenues to the "aggressive corrective action" the Company had taken, as well as the realignment of the sales force and new leadership appointments (*e.g.*, Douglas's replacement of Puckett). For his

part, Defendant Ewing told investors that "churn reduction" as well as a concerted effort to "keep the customers we have and try to make some of the price declines and credits that we've been issuing smaller" led to the improved results.

127.    These representations had their intended effect and reversed a nearly yearlong share price decline.  Analysts at UBS noted that the Company's financials were above guidance and ahead of UBS's expectations, and that "revenues beat across the board." Barclays likewise cited the "healthy strategic services growth led by solid consumer results," calling out the 6% year-over-year revenue growth in consumer revenues and higher ARPU, while JPMorgan analysts were reassured and "expect[ed] revenue trends to continue to move in the right direction."  Over the next several trading days, the Company's shares shot up, increasing over $4 per share, and began trading at their highest levels in over six months.

### The SEC Questions CenturyLink About Its Consumer Segment Disclosures and the Company's Compliance With Item 303

128.    At the same time CenturyLink publicly attributed its rejuvenated revenue growth to a shift in strategy, the Company was pointedly instructed by the SEC to disclose any known trends that impacted its consumer segment results.  Specifically, in correspondence from the SEC's Division of Corporation Finance on August 11, 2015 to Defendant Cole, the SEC requested that CenturyLink provide more information concerning the revenue composition of the Company's consumer segment, as well as the Company's "marketing and sales efforts" of its "strategic" services.  In doing so, the SEC specifically cited the Company's need to comply with Item 303(a) of Regulation S-K and Securities Act Release No. 33-8350, which requires disclosure of, among other things, "any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."

129.    Under Item 303, CenturyLink was required to disclose the fact that the Company's illegal and deceptive sales practices were a material driver of the Company's reported revenue in the consumer and small business segments—and that the Company's efforts to alter those practices, and reduce cramming, had resulted in a decline in revenue. CenturyLink's senior management were aware of and/or specifically approved significant changes to the Company's sales employee discipline and compensation scheme in order to address these practices. The executives of the Company further recognized that, when these changes were made, they immediately and materially impacted revenues. Moreover, that revenue decline was so significant that CenturyLink reverted back to its prior method of disciplining sales employees almost immediately.

130.    On September 8, 2015, the SEC again questioned CenturyLink about the Company's disclosures concerning the operating performance of its consumer segment, stating that additional information about the operating margins of strategic and legacy services was necessary and "material for a complete investor understanding."

131.    In a September 22, 2015 response letter to the SEC from Defendant Cole, which copied CenturyLink's Audit Committee Chair W. Bruce Hanks, CenturyLink misleadingly claimed that "price compression and customer disconnects caused by competition" were the primary drivers of performance. In other words, despite the clear requirements of Item 303 and the Company's knowledge that changes in its sales practices had dramatically impacted consumer revenues – and despite being directly questioned about it by the SEC – CenturyLink continued to conceal the material impact its sales practices was having on the Company's financial performance.

**A CenturyLink Director Loudly Resigns, Warning
that His Removal and Defendant Post's Conduct Raised
"Serious Governance, Transparency and Honesty Issues"**

132.    Shortly after CenturyLink responded to several pointed questions from the SEC
about its consumer segment disclosures, one of the Company's longtime directors accused
CenturyLink and Defendant Post of conduct that raised "serious governance, transparency and
honesty issues," and warned the Company that a press release it had prepared was "incomplete
and inaccurate" and "deliberately misleading in a material way."

133.    Specifically, beginning in November 2015, Defendant Post and other senior
members of the Company's Board began to orchestrate the removal of former director Joseph
Zimmel, who had served on the Board since 2003 and was then one of four members of the
Company's audit committee.  As a member of the audit committee, Zimmel would have been
aware of and reviewed the Company's responses to the SEC about the lack of disclosure
surrounding the Company's consumer segment.

134.    As revealed in email correspondence that Zimmel forced CenturyLink to publicly
file with the SEC, Zimmel was presented with an ultimatum by the Board's chair in December
2015 after several directors "decided [Zimmel] had to go."  Zimmel said his forced resignation
was improperly orchestrated without input from the rest of the Board and was contrary to their
wishes.  As Zimmel put it, except for the "Monroe or Monroe related directors," all disinterested
Board members said that removing Zimmel from the Board "was wrong, that it was not good for
the company, that I added a lot of value, that I was an important and needed voice on the board."

135.    Most concerning, however, is that the facts surrounding Zimmel's ouster would not
have become public if Zimmel had not forced the Company's hand by specifically stating in an
email to Defendant Post, Board Chairman Bill Owens, CenturyLink General Counsel Stacey Goff

and CenturyLink's outside counsel that "[a]nything short of disclosing the full and accurate account of events would be misleading in a material way." At Zimmel's suggestion, CenturyLink publicly filed the emails he exchanged with them in a Form 8-K on January 25, 2016.

136.    As reflected in that correspondence, CenturyLink's senior leadership went to significant lengths to conceal the true facts concerning Zimmel's ouster. As Zimmel told Defendant Post and Goff in those emails, the original draft press release CenturyLink prepared announcing Zimmel's departure was "incomplete and inaccurate" and "deliberately misleading in a material way." As Zimmel explained, the conduct of the Company's senior leadership "raised serious governance, transparency and honesty issues" – and only further corroborates the Executive Defendants' proclivity to mislead.

137.    After the end of the Relevant Period, Zimmel's replacement, Martha Bejar, was one of the two members of the Board appointed as the "special committee" responsible for investigating the billing misconduct at issue in this case.

### The Arizona Attorney General Investigates and Accuses CenturyLink of Fraudulent and Deceptive Conduct, Which CenturyLink "Expressly Denies"

138.    After CenturyLink returned to its prior sales model, billing complaints again began piling up — leading consumers to lodge complaints with their state attorneys general. Those state attorneys general soon began to investigate the reasons behind the rising tide of complaints against the Company.

139.    Beginning no later than March 2016, the Arizona Attorney General launched such an investigation. This investigation found that CenturyLink had engaged in numerous deceptive practices in the sale and marketing of internet and telephone services that violated the Arizona Consumer Fraud Act and, specifically, that CenturyLink had:

- Failed to adequately disclose material qualifying conditions that applied to promotional rates, such as the requirement that consumers enter into a term commitment or that they authorize CenturyLink to automatically withdraw monthly payments from their financial accounts;

- Failed to adequately disclose the advertised promotion rate would end before the consumers' term commitments expire, thus requiring consumers to continue purchasing services at a non-promotional rate for the remainder of the term;

- Failed to disclose that if consumers cancel their contract before their term commitment expires, they will be charged an early termination fee;

- Failed to disclose that a consumer will be required to purchase or lease a modem-router for high speed internet service;

- Failed to disclose that a consumer would be charged an installation fee for certain services;

- Billed consumers at rates higher than those it represented during sales calls with consumers;

- Billed consumers an early termination fee when the consumer cancelled his or service upon discovering that CenturyLink was charging the consumer higher rates than those it represented during the sales call;

- Billed consumers for periods of service before such services were connected, for services that were never connected, and for products that were never received, without subsequently giving those consumers a credit for such charges;

- Billed consumers for services and products that the consumer never requested without subsequently giving those consumers a credit for such charges;

- Failed to process consumers' service cancellation requests in a timely manner and billing them for the period of time such service remained connected following the consumers' requested cancellation date, without providing a subsequent credit for such period of time; and

- Charged consumers full price for leased modems that

consumers returned to CenturyLink within the required time frame and, in many cases, subsequently referring the consumers' accounts to collection when the consumers refused to pay for returned modems.

140.    In the face of the Attorney General's findings, CenturyLink quietly agreed to a settlement in which it promised to take a number of measures intended to prevent consumers from being misled and improperly charged. Specifically, on April 6, 2016, CenturyLink entered into an Assurance of Discontinuance with the Arizona Attorney General in which the Company (falsely) denied any wrongdoing, and where it "expressly denie[d]" each and every one of the Arizona Attorney General's allegations. Indeed, in the Assurance of Discontinuance, CenturyLink claimed that all terms, materially qualifying conditions, termination fees, availability of high speed internet speeds, modem/router purchase requirements and installation fees were "fully disclosed."

141.    Despite the seriousness of the Arizona Attorney General's allegations, CenturyLink resolved the inquiry with a modest $150,000 payment to cover the Attorney General's fees and costs. CenturyLink claimed that it settled the case solely as a "means of efficiently closing the Attorney General's investigation into this matter" and that the settlement did not represent "any admission of guilt, wrongdoing, violation or sanction." Rather, CenturyLink broadly denied "any violation of state, federal, or local law," that "any actions, inactions or practices of CenturyLink were a consumer fraud or otherwise legally improper," or that "any Arizona Consumers who are residential customers of CenturyLink suffered or incurred any damage or loss for which the law provides recourse."

142.    Nevertheless, as part of the Assurance of Discontinuance, which expressly applied to CenturyLink's "officers, directors, managerial [and] supervisory employees," CenturyLink also agreed to comply with a number of prospective requirements intended to ensure compliance with the Arizona consumer protection laws, including:

54

- sending consumers a confirmation of the charges included in their bills after three days of a sale;

- conducting an investigation into any consumer complaints in which a customer alleges being charged for a product or service that was not requested, being charged at a price that was not accurately quoted, or being charged for a modem/router that the customer claimed to have properly and timely returned;

- agreeing that no customer bills would be sent to collections until an investigation was completed and the results were provided to the consumer; and

- confirming with the customer internet speeds before processing a customer's high-speed internet order.

143.    To investors who were unfamiliar with CenturyLink's actual sales practices, the settlement did not appear to reflect any sanction whatsoever – as CenturyLink should have been following the steps required by the agreement in the first place. Indeed, CenturyLink led investors to believe that none of these requirements represented a change in CenturyLink's practices, and the Company "expressly denie[d] that its policies, practices or procedures that may be inconsistent with those set forth in this Assurance of Discontinuance fail to meet or violate any applicable standard."

144.    Due to CenturyLink's strongly worded express denials, and the relatively modest $150,000 payment, the significance of the Arizona Attorney General's investigative findings was obscured from the market. Indeed, CenturyLink did not disclose the Arizona Attorney General's investigation or its settlement in any SEC filing or other public release, and the settlement was not identified or cited by any other public news or other source until months later. As a result, the market barely registered this development, and instead continued to be misled by the Company's false and misleading statements.

145.    Unfortunately, CenturyLink ignored the Assurance of Discontinuance as well.

While the settlement required CenturyLink to implement the steps described above, according to former CenturyLink employees, there is no evidence CenturyLink took any of the affirmative measures required by the order when dealing with Arizona consumers, or any other CenturyLink customers. To the contrary, according to FE-9, "It went in the opposite direction. It got even worse."

**CenturyLink Distinguishes Its Sales and Marketing Practices as
Honest and Legitimate, Criticizing Competitors for Boosting
<u>Revenues By "Adding Fees"</u>**

146.   Just weeks later, the Company again reported favorable results in its consumer segment, which had been buoyed by the improper sales practices identified by the Arizona Attorney General. But instead of disclosing the impact of its actual sales practices on revenues or addressing the Arizona Attorney General settlement, CenturyLink attributed its success to strategy "adjustments."

147.   Specifically, when reporting the Company's first quarter results on May 4, 2016, Dean J. Douglas ("Douglas"), former President, Sales and Marketing, highlighted a change in emphasis to "bundled broadband services" that was purportedly enabling the Company to sign up customers who were "less precluded to churn" and were going to generate a "higher ARPU." Most significantly, Douglas clarified that any difference between CenturyLink's ARPU figures and those of the Company's competitors was the result of its competitors charging unwanted fees—something that Douglas falsely told investors CenturyLink did not do:

> So I would tell you that our ARPUs are consistent with what you'd see at an ARPU level in our competitors. ***And we see competition adding a lot of fees. And so, that's where there might be a little bit of a delta, but we're working through, and constantly monitoring what our competitors are doing in the marketplace, with regard to the average ARPUs in our business.***

56

**CenturyLink's Cramming Practices Continue Unabated While the
Minnesota Attorney General Issues A Civil Investigative Demand
and A Whistleblower Urges Defendant Post to Address the Fraud**

148.    Just one week after Douglas assured investors of the Company's sales practices and ARPUs, on May 12, 2016, the Minnesota Attorney General's Office sent a civil investigative demand to CenturyLink following a growing wave of complaints from Minnesota consumers who had been victimized by the very same deceptive practices as millions of other customers across the country.

149.    As would be revealed, Defendant Post and CenturyLink's senior managers immediately sprung into action after receiving the civil investigative demand. Indeed, CenturyLink's senior management recognized that this new investigation, following on the heels of CenturyLink's settlement with the Arizona Attorney General's inquiry, threatened to expose the Company's scheme. As discussed further below, the Minnesota Attorney General disclosed that the Company engaged in a series of obstructionist tactics to frustrate the investigation.

150.    As CenturyLink's senior management was attempting to keep the Minnesota Attorney General at bay, the Company continued to receive repeated reports, both internally from employees and externally from customers and regulators, concerning the fraudulent practices carried out in the Company's call centers. One such employee, Heidi Heiser, who worked as customer service and sales agent in Arizona beginning in August 2015, brought those issues directly to the attention of Defendant Post.

151.    As she would later allege in a whistleblower lawsuit, Heiser witnessed CenturyLink customers being charged for services that they did not request and that CenturyLink's sales quota and disciplinary systems encouraged this conduct. As Heiser and numerous former employees confirm, this inevitably led to rampant cramming and charging of unauthorized services on

customer accounts, which meaningfully contributed to the revenues that CenturyLink reported to investors. According to Heiser:

> CenturyLink management had not only created the workplace incentives, sales practices, and lack of oversight that encouraged the fraudulent assignment of unauthorized lines or services, and related charges, to customer accounts, but they were knowingly and intentionally ignoring the customer complaints about such practices and enforcing such policies that allowed CenturyLink to keep payments received on unauthorized charges and to encourage more such payments.

152.    At the same time Heiser became increasingly troubled by CenturyLink's fraudulent business practices – which she reported to her direct supervisor (Christine Wells) and as well as two other supervisor-managers (Denise Medina and Michael Del Campo) – a strikingly similar fraudulent scheme at U.S. banking giant Wells Fargo began to make headlines. Specifically, on September 8, 2016, regulators investigating Wells Fargo announced $185 million in fines for the undisclosed company practice of sales representatives adding accounts without customers' knowledge, triggering extensive media coverage and congressional investigations. According to the CenturyLink whistleblower, there were "frightening parallels between the Wells Fargo Bank scandal and what she saw happening at CenturyLink."

153.    After none of her complaints led to any discipline or action by CenturyLink management, Heiser brought her concerns to the Company's CEO. Specifically, in an online Townhall meeting where Company employees had the opportunity to post questions to online message board for review by Defendant Post in October 2016, Heiser posted an online question asking the CEO "why customers were being given multiple accounts and being billed for things they did not ask for" – again alerting CenturyLink's senior-most management to the cramming practices they had monitored for years.

154.    Heiser's question was removed from the message board shortly after she posted it and just two days later, Heiser was alerted she had been suspended—and later terminated—as

retaliation for blowing the whistle. While the Company claimed Heiser was being terminated for hanging up on customers, those disconnections were caused by technical issues that Heiser had for months repeatedly sought help in remedying from her managers and had never before been raised as a concern. As demonstrated by CenturyLink's termination of FE-11, who was fired for refusing to "cram" and sell a "full service" package to a 90-year-old customer who only wanted a line with local service and caller ID, CenturyLink's termination of Heiser for a pre-textual reasons was hardly unique. This was how the Company perpetuated its undisclosed and unlawful billing scheme.

### CenturyLink Continues to Falsely Deny and Downplay Reports of Sales Misconduct

155.    As the Company's misconduct continued unabated, and consumer complaints grew to outsized levels, CenturyLink's practices began to attract the attention of local news outlets. In late 2016 and early 2017, complaints over CenturyLink's billing misconduct began to make headlines, particularly in those areas – such as Seattle, Washington, Portland, Oregon, Omaha, Nebraska, Boise, Idaho, Denver, Colorado, and Minneapolis, Minnesota – where CenturyLink had expanded operations and sought to compete with cable providers.

156.    For example, a February 1, 2017 report by KGW television in Oregon detailed how a Portland resident was promised a discount on her phone, internet and cable TV but after signing up with CenturyLink, was charged nearly four times that rate and was unable to get CenturyLink to correct her bill. As the resident explained, "I felt like it was back-alley tactics." In responding to the story, CenturyLink issued a statement denying any wrongdoing, falsely claiming that:

> CenturyLink strives to provide the best possible service at all times. As a customer-first business, we take any complaint seriously and work diligently to provide each customer with a fair and quick resolution. And where our investigations into complaints show that process changes can improve the customer experience, we make improvements and incorporate them into our employee training and customer outreach.

157.    CenturyLink continued to issue statements like these and similar false denials to at least six local news stations, consistently denying any systemic billing problems, claiming that such complaints were the result of an isolated failure to properly "follow routine billing processes," that the Company promptly investigated and resolved the complaint, and had "put in a new review process for pending offers, installed a new bill estimation tool and the company is simplifying promotional offers." These statements were materially false and misleading because, as the Company knew, customer complaints were not "taken seriously." Instead, CenturyLink arbitrarily limited refunds by placing limits on customer "credits" and customer complaints were in fact treated as additional sales opportunities. Nor was CenturyLink a "customer first" business and the improper and inaccurate bills were not isolated—they were a core part of CenturyLink's business model.

158.    At the same time – despite having implemented CenturyLink's cramming scheme, and separately having been informed about it in myriad ways, including through monthly reporting, communications in connection with investigations by at least two state Attorneys General, and directly by Heiser – the Company continued to represent that it was focused on customers and engaged in ethical sales practices. During the Company's February 8, 2017 earnings call, Defendant Post claimed that CenturyLink had worked hard to "improve the customer experience and make sure that we're more competitive in the marketplace in certain areas," reassuring investors that "we approach our responsibilities each day with a customer-centric mindset." And days later, on February 23, 2017, the Company again touted its Code of Conduct in its Form 10-K for the fiscal year 2016 – which, as before, assured investors that the Company would be "truthful and demonstrate integrity in all our dealings," would "truthfully market, promote, advertise and sell our products" and would not "engage in unethical or deceptive sales

practices," including "plac[ing] or record[ing] an order for our products and services for a customer without that customer's authorization."

## MATERIAL MISSTATEMENTS
## AND OMISSIONS DURING THE RELEVANT PERIOD

159.    During the Relevant Period, the Company made false and misleading statements concerning the Company's business model, financial prospects, and operational and compliance policies, including a failure to disclose that: (i) CenturyLink's aggressive marketing strategy relied on false information to lure and retain customers; (ii) the Company's policies allowed its employees to add services or lines to accounts without customer permission, resulting in millions of dollars in unauthorized charges to CenturyLink customers; (iii) accordingly, the Company's revenues were the product of illicit conduct and unsustainable; (iv) the foregoing illicit conduct was likely to subject CenturyLink to heightened regulatory scrutiny; (v) CenturyLink had inadequate corporate financial reporting resources, inadequately assessed the risks associated with the Company's financial reporting, and failed to maintain effective internal controls over financial reporting; and (vi) as a result of the foregoing, CenturyLink's public statements were materially false and misleading at all relevant times.

160.    On March 1, 2013, the Company filed a Form 10-K with the SEC announcing the Company's financial and operating results for the fiscal fourth quarter and year ended December 31, 2012 (the "2012 10-K"). For the year, the Company reported operating revenues of $18.4 billion, compared to operating revenue of $15.4 billion in the previous year, and adjusted net income of $1.66 billion, compared to adjusted net income of $1.63 billion in the previous year.

161.    With respect to the Company's sales practices, the 2012 10-K stated in relevant part:

**Sales and Marketing**

We maintain local offices in most of the larger population centers within our local service area. These offices provide sales and customer support services in the community. We also rely on our call center personnel to promote sales of services that meet the needs of our customers. *Our strategy is to enhance our communications services by offering a comprehensive bundle of services and deploying new technologies to further enhance customer loyalty*.

*    *    *

*Our approach to our regional markets' residential customers emphasizes customer-oriented sales, marketing and service with a local presence*. We market our products and services primarily through direct sales representatives, inbound call centers, local retail stores, telemarketing and third parties. We support our distribution with direct mail, bill inserts, newspaper advertising, website promotions, public relations activities and sponsorship of community events and sports venues.

Our approach to our regional markets' business and government customers includes a commitment to deliver communications products and services that meet existing and future business needs through bundles of services and integrated service offerings. Our focus is to be a comprehensive communications solution for our small office, mid-sized and select enterprise business and government customers.

Our approach to our wholesale markets' customers includes a commitment to deliver communications solutions that meet existing and future needs of national network telecommunications providers through bandwidth growth and quality of services.

Our approach to our enterprise market – network customers includes a commitment to deliver network products and services that meet existing and future customer needs by offering private line, broadband, MPLS and hosting services and well as local and long-distance services.

Our enterprise market – data hosting operations utilize a solution-based selling approach. By working directly with potential and existing clients, we are able to understand our clients' IT infrastructure and long-term goals. We also market through indirect channels, including collaborations with existing clients and technology providers, telecommunications companies and system integrators.

162.    With respect to regulations and compliance, the 2012 10-K stated in relevant part:

**Regulation**

We are subject to significant regulation by the Federal Communications Commission ("FCC"), which regulates interstate communications, and state utility commissions, which regulate intrastate communications in our local service area.

These agencies issue rules to protect consumers and promote competition; they set the rates that telecommunication companies charge each other for exchanging traffic; and they have established USF to support the provision of services to high-cost areas. In most states, local voice service, switched and special access services and interconnection services are subject to price regulation, although the extent of regulation varies by type of service and geographic region.

\*        \*        \*

**Federal Regulation**

We are required to comply with the Communications Act of 1934, which requires us to offer services at just and reasonable rates and on non-discriminatory terms, as well as the Telecommunications Act of 1996, which amended the Communications Act of 1934 primarily to promote competition.

163.    With respect to the Company's ethics, the 2012 10-K stated in relevant part:

We have adopted written codes of conduct that serve as the code of ethics applicable to our directors, officers and employees, including our principal executive officer and senior financial officers, in accordance with applicable laws and rules promulgated by the SEC and the New York Stock Exchange. In the event that we make any changes (other than by a technical, administrative or non-substantive amendment) to, or applicable to our directors or executive officers, we intend to disclose these events on our website or in a report on Form 8-K filed with the SEC. These codes of conduct, as well as copies of our guidelines on significant governance issues and the charters of our audit committee, compensation committee, nominating and corporate governance committee and risk evaluation committee, are also available in the "Corporate Governance" section of our website at www.centurylink.com/Pages/AboutUs/Governance/ or in print to any shareholder who requests them by sending a written request to

our Corporate Secretary at CenturyLink, Inc., 100 CenturyLink
Drive, Monroe, Louisiana, 71203.

164.    The 2012 10-K contained signed certifications pursuant to the Sarbanes-Oxley Act
of 2002 ("SOX") by Defendants Post and Ewing, certifying that the financial information
contained in the filing was accurate and disclosed any material changes to the Company's internal
control over financial reporting.

165.    On February 27, 2014, the Company filed a Form 10-K with the SEC announcing
the Company's financial and operating results for the fiscal fourth quarter and year ended
December 31, 2013 (the "2013 10-K"). For the quarter, CenturyLink reported net income of $239
million, or $0.41 per diluted share, on revenue of $4.54 billion, compared to net income of $233
million, or $0.37 per diluted share, on revenue of $4.58 billion for the same period in the prior
year. For 2013, CenturyLink reported a net loss of $239 million, or ($0.40) per diluted share, on
revenue of $18.01 billion, compared to net income of $777 million, or $1.25 per diluted share, on
revenue of $18.38 billion for 2012.

166.    The 2013 10-K stated in relevant part:

**Products and Services**

Our products and services include local and long-distance,
broadband, private line (including special access, which we market
to wholesale and business customers), MLPS, data integration,
managed hosting (including cloud hosting), colocation, Ethernet,
network access, public access, wireless, video services and other
ancillary services.

***We offer our customers the ability to bundle together several
products and services***. For example, we offer integrated and
unlimited local and long-distance services. Our customers can also
bundle two or more services such as broadband, video (including
DIRECTV through our strategic partnership), voice and Verizon
Wireless (through our strategic partnership) services. ***We believe
our customers value the convenience and price discounts
associated with receiving multiple services through a single***

*company*.

                    *        *        *

**Sales and Marketing**

We maintain local offices in most of the larger population centers within our local service area. These offices provide sales and customer support services in the community. We also rely on our call center personnel to promote sales of services that meet the needs of our customers. ***Our strategy is to enhance our communications services by offering a comprehensive bundle of services and deploying new technologies to further enhance customer loyalty.***

                    *        *        *

Our approach to our residential customers emphasizes customer-oriented sales, marketing and service with a local presence. We market our products and services primarily through direct sales representatives, inbound call centers, local retail stores, telemarketing and third parties. We support our distribution with direct mail, bill inserts, newspaper and television advertising, website promotions, public relations activities and sponsorship of community events and sports venues.

Our approach to our business and governmental customers includes a commitment to deliver communications and network products and services that meet existing and future business needs through ***bundles of services and integrated service offerings***. Our focus is to be a comprehensive communications solution for our small office, mid-sized and select enterprise business and governmental customers. We market our products and services primarily through direct sales representatives, inbound call centers, telemarketing and third parties.

We support our distribution with direct mail, bill inserts, newspaper and television advertising, website promotions, telemarketing and third parties.

Our approach to our wholesale customers includes a commitment to deliver communications solutions that meet existing and future needs of national network telecommunications providers through bandwidth growth and quality of services.

Our data hosting operations utilize a solution-based selling approach. By working directly with potential and existing clients, we are able to understand our clients' IT infrastructure and long-

term goals. We also market through indirect channels, including collaborations with existing clients and technology providers, telecommunications companies and system integrators.

167.    With respect to regulations and compliance, the 2013 10-K stated in part:

**Regulation**

We are subject to significant regulation by the Federal Communications Commission ("FCC"), which regulates interstate communications, and state utility commissions, which regulate intrastate communications. These agencies (i) issue rules to protect consumers and promote competition, (ii) set the rates that telecommunication companies charge each other for exchanging traffic, and (iii) have traditionally established USF to support the provision of services to high cost areas. In most states, local voice service, switched and special access services and interconnection services are subject to price regulation, although the extent of regulation varies by type of service and geographic region. In addition, we are required to maintain licenses with the FCC and with state utility commissions. Laws and regulations in many states restrict the manner in which a licensed entity can interact with affiliates, transfer assets, issue debt and engage in other business activities, and many acquisitions and divestitures require approval by the FCC and some state commissions.

\*          \*          \*

**Federal Regulation**

**General**

We are required to comply with the Communications Act of 1934, which requires us to offer services at just and reasonable rates and on nondiscriminatory terms, as well as the Telecommunications Act of 1996, which amended the Communications Act of 1934 primarily to promote competition.

168.    With respect to the Company's ethics, the 2013 10-K reiterated the information stated in the 2012 10-K:

We have adopted written codes of conduct that serve as the code of ethics applicable to our directors, officers and employees, in accordance with applicable laws and rules promulgated by the SEC and the New York Stock Exchange.

169.    The 2013 10-K contained signed SOX certifications by Defendants Post and Ewing,
certifying that the financial information contained in the filing was accurate and disclosed any
material changes to the Company's internal control over financial reporting.

170.    On May 9, 2014, the Company filed a Quarterly Report on Form 10-Q with the
SEC announcing the Company's financial and operating results for the quarter ended March 31,
2014 (the "Q1 2014 10-Q"). For the quarter, CenturyLink reported net income of $203 million,
or $0.35 per diluted share, on revenue of $4.54 billion, compared to net income of $298 million,
or $0.48 per diluted share, on revenue of $4.51 billion for the same period in the prior year.

171.    The Q1 2014 10-Q stated in part:

> We are an integrated communications company engaged primarily
> in providing an array of communications services to our residential,
> business, governmental and wholesale customers. Our
> communications services include local and long-distance,
> broadband, private line (including special access), Multi-Protocol
> Label Switching ("MPLS"), data integration, managed hosting
> (including cloud hosting), colocation, Ethernet, network access,
> public access, wireless, video and other ancillary services.
>
> *We strive to maintain our customer relationships by, among other
> things, bundling our service offerings to provide our customers
> with a complete offering of integrated communications services.*
> [Emphasis added].

172.    The Q1 2014 10-Q contained signed SOX certifications by Defendants Post and
Ewing, certifying that the financial information contained in the filing was accurate and disclosed
any material changes to the Company's internal control over financial reporting.

173.    On August 7, 2014, the Company filed a Quarterly Report on Form 10-Q with the
SEC announcing the Company's financial and operating results for the quarter ended June 30,
2014 (the "Q2 2014 10-Q"). For the quarter, CenturyLink reported net income of $193 million,
or $0.34 per diluted share, on revenue of $4.54 billion, compared to net income of $269 million,

or $0.44 per diluted share, on revenue of $4.53 billion for the same period in the prior year.

Commenting on these results, Defendant Post stated:

> Cash flows for the quarter were also strong, primarily due to solid
> revenue performance and continued focus by our employees on
> containing costs.
>
> * * *
>
> We had a strong funnel of sales opportunities entering the third
> quarter and we are looking forward to continuing to execute on our
> strategic priorities to create value for shareholders.

174.    The Q2 2014 10-Q stated in part:

> We are an integrated communications company engaged primarily
> in providing an array of communications services to our residential,
> business, governmental and wholesale customers. Our
> communications services include local and long-distance,
> broadband, private line (including special access), Multi-Protocol
> Label Switching ("MPLS"), data integration, managed hosting
> (including cloud hosting), colocation, Ethernet, network access,
> public access, wireless, video and other ancillary services. We
> strive to maintain our customer relationships by, among other
> things, bundling our service offerings to provide our customers with
> a complete offering of integrated communications services.

175.    The Q2 2014 10-Q was signed by and/or contained a certification of Defendant Post

and stated that the financial information contained in the Q2 2014 10-Q was accurate and disclosed

any material changes to the Company's internal control over financial reporting.

176.    On November 4, 2014, the Company filed a Quarterly Report on Form 10-Q with

the SEC announcing the Company's financial and operating results for the quarter ended

September 30, 2014 (the "Q3 2014 10-Q"). For the quarter, CenturyLink reported net income of

$188 million, or $0.33 per diluted share, on revenue of $4.51 billion, compared to a net loss of

$1.05 billion, or ($1.76) per diluted share, on revenue of $4.52 billion for the same period in the

prior year.

177.    The Q3 2014 10-Q stated in relevant part:

> We are an integrated communications company engaged primarily in providing an array of communications services to our residential, business, governmental and wholesale customers. Our communications services include local and long-distance, broadband, private line (including special access), Multi-Protocol Label Switching ("MPLS"), data integration, managed hosting (including cloud hosting), colocation, Ethernet, network access, public access, wireless, video and other ancillary services. We strive to maintain our customer relationships by, among other things, bundling our service offerings to provide our customers with a complete offering of integrated communications services.

178.    The Q3 2014 10-Q was signed by and/or contained a certification of Defendant Post and stated that the financial information contained in the Q3 2014 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

179.    On November 5, 2014, the Company issued a press release and filed a current report on Form 8-K with the SEC reporting its financial results for the quarter ended September 30, 2014 ("Q3 2014"). For the quarter, CenturyLink reported net income of $188 million, or $0.33 per diluted share, on revenue of $4.51 billion, compared to net loss of $1.05 billion, or $1.76 per diluted share, on revenue of $4.52 billion for the same period in the prior year. Commenting on these results, Defendant Post stated:

> We expect the expansion of our symmetrical 1 gigabit service to 16 cities that we announced in August to create additional opportunities to drive strategic revenue growth from businesses and consumers in the months ahead. Also, we have recently integrated and aligned our sales and service delivery models to improve the consistency and effectiveness of our go-to-market strategies as we remain focused on driving increased sales and operating efficiencies in our business.

180.    On November 6, 2014, the Company filed a quarterly report on Form 10-Q with the SEC (the "Q3 2014 10-Q"), confirming the results in the press release. The Q3 2014 10-Q contained signed SOX certifications by Defendants Post and Ewing, certifying that the financial

information contained in the filing was accurate and disclosed any material changes to the Company's internal control over financial reporting.

181.    On February 24, 2015, the Company filed an Annual Report on Form 10-K with the SEC announcing the Company's financial and operating results for the fiscal fourth quarter and year ended December 31, 2014 (the "2014 10-K"). For the quarter, CenturyLink reported net income of $188 million, or $0.33 per diluted share, on revenue of $4.44 billion, compared to net income of $239 million, or $0.41 per diluted share, on revenue of $4.54 billion for the same period in the prior year. For 2014, CenturyLink reported net income of $772 million, or $1.36 per diluted share, on revenue of $18.03 billion, compared to a net loss of $239 million, or ($0.40) per diluted share, on revenue of $18.01 billion for 2013.

182.    The 2014 10-K stated in relevant part:

**Products and Services**

Our products and services include local and long-distance, broadband, private line (including special access), MPLS, data integration, managed hosting (including cloud hosting), colocation, Ethernet, network access, video, wireless and other ancillary services.

***We offer our customers the ability to bundle together several products and services***. For example, we offer integrated and unlimited local and long-distance services. Our customers can also bundle two or more services such as broadband, video (including DIRECTV through our strategic partnership), voice and Verizon Wireless (through our strategic partnership) services. ***We believe our customers value the convenience and price discounts associated with receiving multiple services through a single company***.

\*            \*            \*

**Sales and Marketing**

We maintain local offices in most of the larger population centers within our local service area. These offices provide sales and

customer support services in the community. We also rely on our call center personnel to promote sales of services that meet the needs of our customers. *Our strategy is to enhance our sales by offering a comprehensive bundle of services and deploying new technologies to further enhance customer loyalty*.

\*       \*       \*

Our approach to our residential customers emphasizes customer-oriented sales, marketing and service with a local presence. We market our products and services primarily through direct sales representatives, inbound call centers, local retail stores, telemarketing and third parties. We support our distribution with direct mail, bill inserts, newspaper and television advertising, website promotions, public relations activities and sponsorship of community events and sports venues.

Similarly, our approach to our business, wholesale and governmental customers includes a commitment to provide comprehensive communications solutions for small office, mid-sized and select enterprise business and governmental customers. We market our products and services primarily through direct sales representatives, inbound call centers, telemarketing and third parties.

We also market through indirect channels, including collaboration with existing clients and technology providers, telecommunications companies and system integrators.

183.    With respect to regulations and compliance, the 2014 10-K stated in relevant part:

**Regulation**

We are subject to significant regulation by the Federal Communications Commission ("FCC"), which regulates interstate communications, and state utility commissions, which regulate intrastate communications. These agencies (i) issue rules to protect consumers and promote competition, (ii) set the rates that telecommunication companies charge each other for exchanging traffic, and (iii) have traditionally established USF to support the provision of services to high-cost areas. In most states, local voice service, switched and special access services and interconnection services are subject to price regulation, although the extent of regulation varies by type of service and geographic region. In addition, we are required to maintain licenses with the FCC and with state utility commissions. Laws and regulations in many states

> restrict the manner in which a licensed entity can interact with affiliates, transfer assets, issue debt and engage in other business activities, and many acquisitions and divestitures require approval by the FCC and some state commissions.

\*        \*        \*

**Federal Regulation**

**General**

> We are required to comply with the Communications Act of 1934, which requires us to offer services at just and reasonable rates and on nondiscriminatory terms, as well as the Telecommunications Act of 1996, which amended the Communications Act of 1934 primarily to promote competition.

184.    The 2014 10-K contained signed SOX certifications by Defendants Post and Ewing, certifying that the financial information contained in the filing was accurate and disclosed any material changes to the Company's internal control over financial reporting.

185.    On May 5, 2015, the Company issued a press release and filed a current report on Form 8-K with the SEC reporting its financial results for the quarter ended March 31, 2015 ("Q1 2015"). For the quarter, CenturyLink reported net income of $192 million, or $0.34 per diluted share, on revenue of $4.45 billion, compared to net income of $203 million, or $0.35 per diluted share, on revenue of $4.54 billion for the same period in the prior year. Commenting on these results, Defendant Post stated:

> We are beginning to see the benefits of the organizational realignment implemented in late 2014, and we are confident our new streamlined operating structure positions us to drive stronger sales results, strategic revenue growth and operating efficiency. We continue to see strong demand from business customers for high-bandwidth data services and our integrated network and IT managed services solutions.

186.    On May 6, 2015, CenturyLink filed a Quarterly Report on Form 10-Q with the SEC announcing the Company's financial and operating results for the quarter ended March 31, 2015

(the "Q1 2015 10-Q"). For the quarter, CenturyLink reported net income of $192 million, or $0.34 per diluted share, on revenue of $4.45 billion, compared to net income of $203 million, or $0.35 per diluted share, on revenue of $4.54 billion for the same period in the prior year.

187.    The Q1 2015 10-Q stated in part:

> We are an integrated communications company engaged primarily in providing an array of communications services to our residential, business, governmental and wholesale customers. Our communications services include local and long-distance, broadband, private line (including special access), Multi-Protocol Label Switching ("MPLS"), data integration, managed hosting (including cloud hosting), colocation, Ethernet, network access, video, wireless and other ancillary services. We strive to maintain our customer relationships by, among other things, bundling our service offerings to provide our customers with a complete offering of integrated communications services.

188.    On May 6, 2015, the Company filed a quarterly report on Form 10-Q with the SEC (the "Q1 2015 10-Q"), confirming the results in the press release. The Q1 2015 10-Q contained signed SOX certifications by Defendants Post and Ewing, certifying that the financial information contained in the filing was accurate and disclosed any material changes to the Company's internal control over financial reporting.

189.    Then, on June 24, 2015, the Company held an analyst day during which CenturyLink's management, including defendant Post, discussed the Company's business and prospects. During the day's presentations, CenturyLink surprised investors and analysts by disclosing unexpected softness in the Company's sales following the sudden departure of Karen Puckett ("Puckett") (CenturyLink's President of Global Markets), who had been tasked with leading the reorganization of the Company's salesforce and new sales initiatives little more than six months previously. Equity analysts following the Company expressed concern at Ms. Puckett's abrupt retirement so soon after taking the reins of a major sales initiative, as it exposed unexpected

turbulence in the Company's critical sales operations and an increased reliance on growing consumer sales to offset weakness in CenturyLink's business segment.

190.    On this news, the price of CenturyLink common stock dropped $2.63 per share, or more than 8%, over two trading days to close at $29.92 per share on June 25, 2015.

191.    On August 5, 2015, the Company issued a press release and filed a current report on Form 8-K with the SEC reporting its financial results for the quarter ended June 30, 2015 ("Q2 2015"). For the quarter, CenturyLink reported net income of $143 million, or $0.26 per diluted share, on revenue of $4.42 billion, compared to net income of $193 million, or $0.34 per diluted share, on revenue of $4.54 billion for the same period in the prior year. Commenting on these results, Defendant Post stated:

> The sales force realignment that we completed earlier this year is gaining traction and beginning to positively impact our results. For example, the improvement in sales to business customers that began in March continued throughout the quarter, resulting in 15% sequential growth in Business sales compared to first quarter sales.
>
> In addition, we exited the second quarter with a strong funnel of sales opportunities, which has continued to grow. While our path to revenue and cash flow growth is taking longer than we initially anticipated, we remain confident that we have the right assets and strategies to drive long-term revenue growth.

192.    On August 6, 2015, the Company filed a Quarterly Report on Form 10-Q with the SEC announcing the Company's financial and operating results for the quarter ended June 30, 2015 (the "Q2 2015 10-Q"). For the quarter, CenturyLink reported net income of $143 million, or $0.26 per diluted share, on revenue of $4.42 billion, compared to net income of $193 million, or $0.34 per diluted share, on revenue of $4.54 billion for the same period in the prior year.

193.    The Q2 2015 10-Q stated in relevant part:

> We are an integrated communications company engaged primarily in providing an array of communications services to our residential

and business customers. Our communications services include local and long-distance, broadband, private line (including special access), Multi-Protocol Label Switching ("MPLS"), data integration, managed hosting (including cloud hosting), colocation, Ethernet, network and public access, video, wireless and other ancillary services. We strive to maintain our customer relationships by, among other things, bundling our service offerings to provide our customers with a complete offering of integrated communications services.

194.    The Q2 2015 10-Q contained signed SOX certifications by Defendants Post and Ewing, certifying that the financial information contained in the filing was accurate and disclosed any material changes to the Company's internal control over financial reporting.

195.    On November 4, 2015, the Company issued a press release and filed a current report on Form 8-K with the SEC reporting its financial results for the quarter ended September 30, 2015 ("Q3 2015"). For the quarter, CenturyLink reported net income of $205 million, or $0.37 per diluted share, on revenue of $4.55 billion, compared to net income of $188 million, or $0.33 per diluted share, on revenue of $4.51 billion for the same period in the prior year. Commenting on these results, Defendant Post stated:

> We exited the quarter with a very strong business sales funnel, including an increased number of large deal opportunities. This funnel has continued to strengthen during the fourth quarter and October sales results were the highest of the year.

196.    On November 5, 2015, the Company filed a Quarterly Report on Form 10-Q with the SEC announcing the Company's financial and operating results for the quarter ended September 30, 2015 (the "Q3 2015 10-Q"). For the quarter, CenturyLink reported net income of $205 million, or $0.37 per diluted share, on revenue of $4.55 billion, compared to net income of $188 million, or $0.33 per diluted share, on revenue of $4.51 billion for the same period in the prior year.

197.    The Q3 2015 10-Q stated in relevant part:

> We are an integrated communications company engaged primarily in providing an array of communications services to our residential and business customers. Our communications services include local and long-distance, highspeed Internet, Multi-Protocol Label Switching ("MPLS"), private line (including special access), data integration, Ethernet, colocation, managed hosting (including cloud hosting), network, public access, video, wireless and other ancillary services. We strive to maintain our customer relationships by, among other things, bundling our service offerings to provide our customers with a complete offering of integrated communications services.

198. The Q3 2015 10-Q contained signed SOX certifications by Defendants Post and Ewing, certifying that the financial information contained in the filing was accurate and disclosed any material changes to the Company's internal control over financial reporting.

199. On February 25, 2016, the Company filed a Form 10-K with the SEC announcing the Company's financial and operating results for the fiscal fourth quarter and year ended December 31, 2015 (the "2015 10-K"). For the year, the Company reported operating revenues of $17.9 billion, compared to operating revenues of $18 billion in the previous year, and adjusted net income of $1.5 billion, compared to adjusted net income of $1.49 billion in the previous year.

200. The 2015 10-K stated in relevant part:

**Products and Services**

Our products and services include local and long-distance voice, highspeed Internet, MPLS, private line (including special access), data integration, Ethernet, colocation, managed hosting (including cloud hosting), network, public access, video, wireless and other ancillary services.

***We offer our customers the ability to bundle together several products and services***. For example, we offer integrated and unlimited local and long-distance voice services. Our customers can also bundle two or more services such as highspeed Internet, video (including DIRECTV through our strategic partnership), voice and Verizon Wireless (through our strategic partnership) services. ***We believe our customers value the convenience and price discounts associated with receiving multiple services through a single***

*company.*                *       *       *

**Sales and Marketing**

We maintain local offices in most of the larger population centers within our local service area. These offices provide sales and customer support services in the community. We also rely on our call center personnel and a variety of channel partners to promote sales of services that meet the needs of our customers. *Our sales and marketing strategy is to enhance our sales by offering solutions tailored to the needs of our various customers and promoting our brands.*

Our offerings include both standalone services and bundled services designed to meet the needs of different customer segments.

*       *       *

Our sales and marketing approach to our residential customers emphasizes customer-oriented sales, marketing and service with a local presence. Our marketing plans include marketing our products and services primarily through direct sales representatives, inbound call centers, local retail stores, telemarketing and third parties, including retailers, satellite television providers, door to door sales agents and digital marketing firms. We support our distribution with digital marketing, direct mail, bill inserts, newspaper and television advertising, website promotions, public relations activities and sponsorship of community events and sports venues.

Similarly, our sales and marketing approach to our business customers includes a commitment to provide comprehensive communications and IT solutions for business, wholesale and governmental customers of all sizes, ranging from small offices to select enterprise customers. Our marketing plans include marketing our products and services primarily through digital advertising, direct sales representatives, inbound call centers, telemarketing and third parties, including telecommunications agents, system integrators, value-added resellers and other telecommunications firms. We support our distribution through digital advertising, events, television advertising, website promotions and public relations.

201.   With respect to regulations and compliance, the 2015 10-K stated in relevant part:

**Regulation**

77

*     *     *

> We are subject to significant regulation by the Federal
> Communications Commission ("FCC"), which regulates interstate
> communications, and state utility commissions, which regulate
> intrastate communications. These agencies (i) issue rules to protect
> consumers and promote competition, (ii) set the rates that
> telecommunication companies charge each other for exchanging
> traffic, and (iii) have traditionally developed and administered
> support programs designed to subsidize the provision of services to
> high-cost rural areas.

*     *     *

> **Federal Regulation**
>
> **General**
>
> We are required to comply with the Communications Act of 1934.
> Among other things, this law requires our ILECs to offer various of
> our legacy services at just and reasonable rates and on non-
> discriminatory terms. The Telecommunications Act of 1996
> materially amended the Communications Act of 1934, primarily to
> promote competition.

202. The 2015 10-K was signed by Defendant Posts and Ewing and stated that the financial information contained in the 2015 10-K was accurate and disclosed any material changes to the Company's internal control over financial reporting.

203. On May 4, 2016, the Company issued a press release and filed a current report on Form 8-K with the SEC reporting its financial results for the quarter ended March 31, 2016 ("Q1 2016"). For the quarter, CenturyLink reported net income of $236 million, or $0.44 per diluted share, on revenue of $4.4 billion, compared to net income of $192 million, or $0.34 per diluted share, on revenue of $4.45 billion for the same period in the prior year. Commenting on these results, Defendant Post stated:

> CenturyLink achieved another solid quarter, with core revenues,
> operating cash flow and adjusted diluted earnings per share in-line

78

with our previous guidance.

*  *  *

We remain on track with our data centers and colocation business strategic alternatives process and are pleased with the level of interest and progress to date. We continue to focus on leveraging our strategic asset portfolio and financial strength to execute on our operational initiatives and better serve our customers.

204.    On May 5, 2016, the Company filed a Quarterly Report on Form 10-Q with the SEC announcing the Company's financial and operating results for the quarter ended March 31, 2016 (the "Q1 2016 10-Q").  For the quarter, CenturyLink reported net income of $236 million, or $0.44 per diluted share, on revenue of $4.4 billion, compared to net income of $192 million, or $0.34 per diluted share, on revenue of $4.45 billion for the same period in the prior year.

205.    The Q1 2016 10-Q stated in relevant part:

We are an integrated communications company engaged primarily in providing an array of communications services to our residential and business customers.  Our communications services include local and long-distance voice, high-speed Internet, Multi-Protocol Label Switching ("MPLS"), private line (including special access), data integration, Ethernet, colocation, managed hosting (including cloud hosting), network, public access, video, wireless and other ancillary services.  We strive to maintain our customer relationships by, among other things, bundling our service offerings to provide our customers with a complete offering of integrated communications services.

206.    The Q1 2016 10-Q was signed by and/or contained a certification of Defendants Post and Ewing and stated that the financial information contained in the Q1 2016 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

207.    On August 3, 2016, the Company issued a press release and filed a current report on Form 8-K with the SEC reporting its financial results for the quarter ended June 30, 2016 ("Q2

2016"). For the quarter, CenturyLink reported net income of $196 million, or $0.36 per diluted share, on revenue of $4.4 billion, compared to net income of $143 million, or $0.26 per diluted share, on revenue of $4.42 billion for the same period in the prior year. Commenting on these results, Defendant Post stated:

> Our new sales and marketing leadership team continues to refine our sales channels and associated go-to-market strategies for the Business market and continues to pivot toward higher-value bundled solutions for the Consumer market. While second quarter Consumer subscriber metrics were softer than anticipated, we expect to see an improvement in unit trends in the second half of the year.

208.    On August 4, 2016, the Company filed a Quarterly Report on Form 10-Q with the SEC announcing the Company's financial and operating results for the quarter ended June 30, 2016 (the "Q2 2016 10-Q"). For the quarter, CenturyLink reported net income of $196 million, or $0.36 per diluted share, on revenue of $4.4 billion, compared to net income of $143 million, or $0.26 per diluted share, on revenue of $4.42 billion for the same period in the prior year.

209.    The Q2 2016 10-Q stated in relevant part:

> We are an integrated communications company engaged primarily in providing an array of services to our residential and business customers. Our communications services include local and long-distance voice, broadband, Multi- Protocol Label Switching ("MPLS"), private line (including special access), Ethernet, colocation, hosting (including cloud hosting and managed hosting), data integration, video, network, public access, Voice over Internet Protocol ("VoIP"), information technology and other ancillary services. We strive to maintain our customer relationships by, among other things, bundling our service offerings to provide our customers with a complete offering of integrated communications services.

210.    The Q2 2016 10-Q was signed by and/or contained a certification of Defendants Post and Ewing and stated that the financial information contained in the Q2 2016 10-Q was accurate and disclosed any material changes to the Company's internal control over financial

reporting.

211.    On October 31, 2016, the Company entered into an agreement and plan of merger to acquire Level 3, in a cash and stock transaction valued at approximately $34 billion, including the assumption of debt. The combined company positions CenturyLink as the second largest domestic communications provider, serving global enterprise customers in more than 60 countries.

212.    Also, on October 31, 2016, the Company issued a press release and filed a current report on Form 8-K with the SEC reporting its financial results for the quarter ended September 30, 2016 ("Q3 2016"). For the quarter, CenturyLink reported net income of $152 million, or $0.28 per diluted share, on revenue of $4.38 billion, compared to net income of $205 million, or $0.37 per diluted share, on revenue of $4.55 billion for the same period in the prior year.

213.    On November 4, 2016, the Company filed a Quarterly Report on Form 10-Q with the SEC announcing the Company's financial and operating results for the quarter ended September 30, 2016 (the "Q3 2016 10-Q"). For the quarter, CenturyLink reported net income of $152 million, or $0.28 per diluted share, on revenue of $4.38 billion, compared to net income of $205 million, or $0.37 per diluted share, on revenue of $4.55 billion for the same period in the prior year.

214.    The Q3 2016 10-Q stated in relevant part:

> We are an integrated communications company engaged primarily in providing an array of services to our residential and business customers. Our communications services include local and long-distance voice, broadband, Multi-Protocol Label Switching ("MPLS"), private line (including special access), Ethernet, colocation, hosting (including cloud hosting and managed hosting), data integration, video, network, public access, Voice over Internet Protocol ("VoIP"), information technology and other ancillary services. We strive to maintain our customer relationships by, among other things, bundling our service offerings to provide our customers with a complete offering of integrated communications services.

215.   The Q3 2016 10-Q was signed by and/or contained a certification of Defendants Post and Ewing and stated that the financial information contained in the Q3 2016 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

216.   On February 23, 2017, the Company filed an Annual Report on Form 10-K with the SEC announcing the Company's financial and operating results for the fiscal fourth quarter and year ended December 31, 2016 (the "2016 10-K"). For the quarter, CenturyLink reported net income of $42 million, or $0.08 per diluted share, on revenue of $4.29 billion, compared to net income of $338 million, or $0.62 per diluted share, on revenue of $4.48 billion for the same period in the prior year. For 2016, CenturyLink reported net income of $626 million, or $1.16 per diluted share, on revenue of $17.47 billion, compared to net income of $878 million, or $1.58 per diluted share, on revenue of $17.9 billion for 2015.

217.   The 2016 10-K stated in relevant part:

**Products and Services**

\*      \*      \*

Our products and services include local and long-distance voice, broadband, MPLS, private line (including special access), Ethernet, colocation, hosting (including cloud hosting and managed hosting), data integration, video, network, public access, VoIP, information technology and other ancillary services.

*We offer our customers the ability to bundle together several products and services*. For example, we offer integrated and unlimited local and long-distance voice services. Our customers can also bundle two or more services such as broadband, video (including DIRECTV through our strategic partnership), voice and Verizon Wireless (through our strategic partnership) services. *We believe our customers value the convenience and price discounts associated with receiving multiple services through a single company.*

\*       \*       \*

**Sales and Marketing**

We maintain local offices in most of the larger population centers within our local service area. These offices provide sales and customer support services in the community. We also rely on our call center personnel and a variety of channel partners to promote sales of services that meet the needs of our customers. *Our sales and marketing strategy is to enhance our sales by offering solutions tailored to the needs of our various customers and promoting our brands. Our offerings include both stand-alone services and bundled services designed to meet the needs of different customer segments.*

\*       \*       \*

Our sales and marketing approach to our residential customers emphasizes customer-oriented sales, marketing and service with a local presence. Our marketing plans include marketing our products and services primarily through direct sales representatives, inbound call centers, local retail stores, telemarketing and third parties, including retailers, satellite television providers, door to door sales agents and digital marketing firms. We support our distribution with digital marketing, direct mail, bill inserts, newspaper and television advertising, website promotions, public relations activities and sponsorship of community events and sports venues.

Similarly, our sales and marketing approach to our business customers includes a commitment to provide comprehensive communications and IT solutions for business, wholesale and governmental customers of all sizes, ranging from small offices to select enterprise customers. We strive to offer our business customers stable, reliable, secure and trusted solutions. Our marketing plans include marketing our products and services primarily through digital advertising, direct sales representatives, inbound call centers, telemarketing and third parties, including telecommunications agents, system integrators, value-added resellers and other telecommunications firms. We support our distribution through digital advertising, events, television advertising, website promotions and public relations.

With respect to regulations and compliance, the 2016 10-K stated in part:

**Regulation**

\*      \*      \*

We are subject to significant regulation by the FCC, which regulates interstate communications, and state utility commissions, which regulate intrastate communications. These agencies (i) issue rules to protect consumers and promote competition, (ii) set the rates that telecommunication companies charge each other for exchanging traffic, and (iii) have traditionally developed and administered support programs designed to subsidize the provision of services to high-cost rural areas.

\*      \*      \*

**Federal Regulation**

**General**

We are required to comply with the Communications Act of 1934.

Among other things, this law requires our incumbent local exchange carriers ("ILECs") to offer various legacy services at just and reasonable rates and on nondiscriminatory terms. The Telecommunications Act of 1996 materially amended the Communications Act of 1934, primarily to promote competition.

218.    The 2016 10-K was signed by Defendants Post and Ewing and stated that the financial information contained in the 2016 10-K was accurate and disclosed any material changes to the Company's internal control over financial reporting.

219.    On May 3, 2017, the Company issued a press release and filed a current report on Form 8-K with the SEC reporting its financial results for the quarter ended March 31, 2017 ("Q1 2017"). For the quarter, CenturyLink reported net income of $163 million, or $0.30 per diluted share, on revenue of $4.21 billion, compared to net income of $236 million, or $0.44 per diluted share, on revenue of $4.4 billion for the same period in the prior year. Commenting on these results, Defendant Post stated:

CenturyLink's first quarter high-bandwidth data services revenues

for Enterprise customers grew by 2% sequentially and 4% year-over-year, driven by increasing demand for higher-speed Enterprise data services as businesses continue their digital transformation. . . .This increasing demand further validates the rationale for our pending acquisition of Level 3 Communications, which will transform CenturyLink into the second largest domestic communications provider serving global enterprise customers.

We continue to make good progress in obtaining the necessary approvals for the pending Level 3 acquisition and integration planning for the combination is on track. We are very pleased with the extremely talented and experienced senior leadership team for the combined company, announced last week, which will be effective at closing. We continue to expect to complete the transaction by the end of September 2017.

220.    On May 5, 2017, the Company filed a Quarterly Report on Form 10-Q with the

SEC announcing the Company's financial and operating results for the quarter ended March 31,

2017 (the "Q1 2017 10-Q"). For the quarter, CenturyLink reported net income of $163 million,

or $0.30 per diluted share, on revenue of $4.21 billion, compared to net income of $236 million,

or $0.44 per diluted share, on revenue of $4.4 billion for the same period in the prior year.

221.    The Q1 2017 10-Q stated in relevant part:

We are an integrated communications company engaged primarily in providing an array of services to our residential and business customers. Our communications services include local and long-distance voice, broadband, Multi-Protocol Label Switching ("MPLS"), private line (including special access), Ethernet, colocation, hosting (including cloud hosting and managed hosting), data integration, video, network, public access, Voice over Internet Protocol ("VoIP"), information technology and other ancillary services. We strive to maintain our customer relationships by, among other things, bundling our service offerings to provide our customers with a complete offering of integrated communications services.

222.    The Q1 2017 10-Q was signed by and/or contained a certification of Defendants

Post and Ewing and stated that the financial information contained in the Q1 2017 10-Q was

accurate and disclosed any material changes to the Company's internal control over financial

reporting.

      223.    On June 1, 2017, the Company issued a press release and filed a current report on

Form 8-K with the SEC announcing the Company's CEO succession plan. The press release stated,

in relevant part:

> MONROE, La. – CenturyLink, Inc. (NYSE: CTL) today announced that upon closing of the CenturyLink – Level 3 acquisition, Jeff Storey, currently president and CEO of Level 3 Communications, Inc. (NYSE: LVLT), will join CenturyLink as its president and chief operating officer. As previously announced, after the closing Glen F. Post III will remain CEO of CenturyLink. It is expected that Storey will succeed Post as CEO of CenturyLink effective Jan. 1, 2019 and that Post will then become executive chairman of the company's board of directors.
>
> The two companies continue to expect to close the transaction by Sept. 30, 2017.
>
> "Throughout our company's evolution, we have focused on investment, growth and value creation. I am pleased that our collective work has put us at the forefront of the digital world. As we move into this next phase of our growth, I am confident in the strength of our position, the scope of our opportunity and Jeff's ability to lead our company forward – first as president and COO and then as CEO," Post said.
>
> "Transitions like this are bittersweet, but I am confident this is the right time to begin to take this next step into our future. At CenturyLink, I have had the privilege of working with some of the most talented people in our industry. Their leadership, dedication, loyalty and tireless efforts have been – and will continue to be – the key to our success. I look forward to joining forces with Jeff and the talented employees from Level 3 as we pursue the exciting opportunities that lie ahead."
>
> "Jeff has been an excellent leader for Level 3 and shares our excitement about the future of our business and the importance of world-class customer experience to our success," Post said. "Just as important, Jeff shares my focus on continuing to invest in our network, products and services to meet our customers' needs. I look forward to continuing to work closely with Jeff to shape the future of the combined company."

"Glen has done an exceptional job leading CenturyLink over the last 25 years, steadily transforming the company to become a leading international communications provider," Storey said. "I strongly believe in the combination of the two companies and I am very excited to become part of the CenturyLink management team after the transaction closes. I look forward to continuing to work with Glen to drive a successful integration, an outstanding customer experience and growth in shareholder value. The opportunities ahead of us are exciting and I am committed to building on this impressive foundation."

*    *    *

CenturyLink also announced that Harvey P. Perry, vice chairman of the board of CenturyLink, has been appointed chairman of the board, effective immediately. He replaces William A. Owens, who retired from the board on May 24, 2017. W. Bruce Hanks, a member of the CenturyLink board of directors, has been named vice chairman, also effective immediately. As previously announced, Storey is one of four Level 3 board members who will join the CenturyLink board at closing.

224.    On June 14, 2017, the Company's stock closed at $27.31 per share.

225.    The statements referenced above were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operations and financial condition, which were known to Defendants or recklessly disregarded by them. Specifically, the Company made false and misleading statements and/or failed to disclose that: (a) CenturyLink's policies allowed its employees to add services or lines to accounts without customer permission, resulting in millions of dollars in unauthorized charges to CenturyLink customers; (b) CenturyLink's illicit practices were designed to allow it to gain an advantage over its competitors and to increase profits; (c) CenturyLink's illicit conduct was likely to subject it to heightened regulatory scrutiny; and (d) CenturyLink's revenues were the product of illicit conduct and were unsustainable.

226.    As a result of the foregoing, the above statements during the Relevant Period were

false and misleading and/or lacked a reasonable basis.

## THE TRUTH EMERGES

227.    On June 14, 2017, a former CenturyLink sales representative named Heidi Heiser

filed a whistleblower complaint in Arizona state court, *Heiser v. CenturyLink*, Inc., Case No.

CV2017-008928 (Maricopa Cty. Super. Ct.) (the "Heiser Complaint").  In the Heiser Complaint,

Ms. Heiser alleged that her employment with the Company was terminated after she reported

unlawful billing practices that she had observed and refused to take part in.

228.    On June 16, 2017, *Bloomberg* published an article entitled "CenturyLink Is

Accused of Running a Wells Fargo-Like Scheme." The *Bloomberg* article reported, in relevant

part:

> A former CenturyLink Inc. employee claims she was fired for
> blowing the whistle on the telecommunications company's high-
> pressure sales culture that *left customers paying millions of dollars*
> *for accounts* they didn't request, according to a lawsuit filed this
> week in Arizona state superior court.
>
> \*        \*        \*
>
> The plaintiff, Heidi Heiser, worked from her home for CenturyLink
> as a customer service and sales agent from August 2015 to October
> 2016.  The suit claims she was fired days after notifying Chief
> Executive Officer Glen Post of the alleged scheme during a
> companywide question-and-answer session held on an internal
> message board.
>
> The complaint alleges CenturyLink *"allowed persons who had a*
> *personal incentive to add services or lines to customer accounts to*
> *falsely indicate on the CenturyLink system the approval by a*
> *customer of new lines or services."* This would sometimes result
> in charges that hadn't been authorized by customers, according to
> the complaint.
>
> \*        \*        \*
>
> Heiser's complaint alleges that she became increasingly concerned
> about what she observed at CenturyLink after news of Wells Fargo

& Co.'s regulatory troubles broke in September.  In that case, Wells Fargo employees opened deposit and credit card accounts without customers' consent to earn incentives and meet sales goals.  Without admitting wrongdoing, Wells Fargo ended up firing more than 5,000 employees and agreeing to pay $185 million in fines, in addition to compensating customers for fees related to the unauthorized accounts.

***The complaint likens what Heiser said CenturyLink sales agents did to the Wells Fargo scandal*** and estimated the alleged unauthorized fees amounted to "many millions" of dollars.  She says her concerns were bolstered by posts she had read on review websites.

A review of Yelp and Pissed Consumer finds evidence of irate customers.

"They signed me up unauthorized," wrote Sierrah U. of Bend, Ore., on Yelp in February 2015.  "I was talking to someone interested in signing up two weeks ago after realizing my modem was incapable I told the guy I didn't want to sign up and I would call back later if I was still interested, he got really upset hung up on me.  Two weeks later I receive a bill!  With a ton a fees, I don't even have internet with them!"

***When a customer complained about an unauthorized charge, customer service and sales agents like Heiser were directed "to inform the complaining customer that CenturyLink's system indicated the customer had approved the service,"*** according to the complaint, and as a result "it was really the customer's word against CenturyLink."

"CenturyLink is going to be in a world of hurt if this turns out to be true," said Roger Entner, an analyst with Recon Analytics.

***Initially, Heiser told her direct superiors about her suspicions and was told in response to her complaints to "stay positive and not to mention her concerns again,"*** according to the complaint.  Heiser didn't report her concerns to the Federal Communications Commission or the Occupational Safety and Health Administration, a division of the U.S. Department of Labor.

Five months before she was fired, Heiser said, she experienced dropped calls with customers due to what the complaint described as a "malfunctioning system."  She reported the issue repeatedly to superiors, according to the complaint.  The dropped calls were

allegedly cited by CenturyLink as the reason for her dismissal, which came two days after the question-and-answer session.

To lead the combined operations of CenturyLink and Level 3, activist investor Keith Meister's hedge fund, Corvex Management LLP, had sought a telecom veteran, prevailing with Storey's selection. (Meister says Corvex has built up a 5.5 percent stake in CenturyLink.) Still, Post, the current CEO, will stay on as executive chairman when Storey takes the helm.

Phone service giants such as AT&T Inc., Verizon Communications Inc., and Sprint have all settled cases in which third-party companies had been adding services to customers' phone bills without consent. These "cramming" issues typically involved $9.99 monthly charges for horoscopes and trivia games. That is different from a telephone company employee who may be looking to meet sales goals by creating false accounts or adding services to existing accounts without the subscriber's knowledge or consent.

T-Mobile U.S. Inc. was the subject of a critical report in December from a labor group called Change to Win Retail Initiatives that said the carrier put its sales staff under pressure to meet difficult sales goals. The pressure caused T-Mobile employees to force some customers to enroll in services they didn't necessarily want or authorize, according to the report. T-Mobile declined to comment on the allegation.

"When sales targets are unrealistic and employees' livelihoods are at stake, some people are going to take shortcuts," said Entner, the telecom analyst.

"Companies have the responsibility to make sure the goals are realistic. You don't want to drive people to break the law."

229.    As a result of this news, the price of CenturyLink shares dropped $1.23 per share to close at $25.72 per share on June 16, 2017, a decline of nearly 5% on volume of 43 million shares.

230.    Then, on June 19, 2017, the *Bloomberg* published a second article entitled "CenturyLink Faces Class-Action Lawsuit Seeking Up to $12 Billion." The article stated in part:

The new lawsuit, filed in the central district of California late Sunday night, cites Heiser's suit, as well as similar accusations

posted on social media and consumer review websites by people identifying themselves as CenturyLink customers, and accuses CenturyLink of fraud, unfair competition, and unjust enrichment.

"Ms. Heiser's allegations of what she observed, and what CenturyLink corporate culture encouraged, are consistent with the experiences of hundreds of thousands and potentially millions of consumers who have been defrauded by CenturyLink," the complaint states. "It is estimated that the damages to consumers could range between $600 million and $12 billion, based on CenturyLink's 5.9 million subscribers."

"The fact that a law firm is trying to leverage a wrongful termination suit into a putative class action lawsuit does not change our original position," Mark Molzen, a CenturyLink spokesman, said in a statement, adding that Heiser failed to report her allegations to the company's 24-hour Integrity Line. He said her claims "are completely inconsistent" with company policy and culture and that "we take these allegations seriously and are diligently investigating this matter."

Class actions are common after contentious allegations against large companies. Sunday's lawsuit was brought on behalf of the consumers by the Geragos & Geragos law firm, led by celebrity attorney Mark J. Geragos. Heiser didn't report her concerns to the Federal Communications Commission or other authorities.

The named plaintiffs in the case are Craig McLeod and Steven L. McCauley, both current customers of CenturyLink. During a conversation in early April with a sales agent on CenturyLink's website, McLeod, 65, was offered a faster internet link for an extra $2 a month with a two-year contract, and accepted, according to the complaint. He alleges he incurred considerably higher fees than quoted and was charged for a repair that never was made.

231.    As a result of this news, the price of CenturyLink shares declined another $0.36 per share to close at $25.36 per share on June 19, 2017.

232.    On June 26, 2017, an analyst from Barclay's Capital Inc. published a report entitled "The Roz Report: A Risk Framework for Recent CenturyLink Allegations." The report cited allegations of fraudulent business practices by the Company and noted "we expect [the allegations] to serve as a lingering overhang on the shares . . . ."

233.    On July 13, 2017, the *StarTribune* reported that Minnesota's attorney general, Lori

Swanson, had filed a lawsuit alleging that CenturyLink had improperly billed its customers.

According to the article:

> Minnesota Attorney General Lori Swanson sued CenturyLink on
> Wednesday as she alleged that the internet, phone and cable
> television provider frequently billed Minnesota customers at higher
> rates than its sales agents quoted. Flanked by Minnesotans who
> have filed some of the "hundreds" of complaints about charges they
> say they didn't agree to, Swanson said she's asking a judge to
> impose civil penalties, order the company to change its sales
> practices and require that CenturyLink pay restitution to customers
> who were misled about their purchases.
>
> "I want [CenturyLink] to knock it off," Swanson said. "It is not OK
> for a company to quote one price and then charge another for
> something as basic as cable television and internet service. We want
> an injunction so the company stops doing this to other people, and
> hopefully fixes the problem for these people as well."
>
> The lawsuit, filed in Anoka County District Court, accuses
> Louisiana-based CenturyLink of committing consumer fraud and
> engaging in deceptive trade practices. It cites 37 specific cases in
> which people were overbilled by the company and denied the
> opportunity to reduce those charges — even when they had the
> original offer in writing.

234.    Details continued to emerge of the Company's pattern of improper sales practices,

resulting in a deluge of additional lawsuits. Class action suits against CenturyLink on behalf of

the Company's customers were filed in numerous states including Alabama, Arizona, California,

Colorado, Idaho, Nevada, Oregon, and Washington.

235.    On October 23, 2017, CenturyLink entered into a stipulated order with the

Minnesota Attorney General. Among other things, the Company agreed to:

> (a)    Not make any false statement of material fact or omit any
> material fact in connection with the sale of internet and/or
> television services to Minnesota consumers; and
>
> (b)    Provide, at the time of sale:
>> (i)    The monthly base price of the services purchased;

(ii)   The amount of each monthly recurring fee in addition
       to the monthly base price;
(iii)  The amount of monthly access recovery charges;
(iv)   All one-time fees charged to the initial bill;
(v)    The amount of the first invoice;
(vi)   Recurring total costs;
(vii)  Total duration of the agreement; and
(viii) Any restrictions or conditions on a consumer's
       ability to receive the quoted price.

236.   On November 1, 2017, CenturyLink completed its acquisition of Level 3. In

connection with the acquisition, CenturyLink issued a press release and filed a current report on

Form 8-K with the SEC stating, in relevant part:

> Management Transitions. In accordance with our previously-
> announced succession plan, Glen F. Post, III stepped down from the
> role of President of CenturyLink effective upon completion of the
> Initial Merger (such time, the "Closing"). Mr. Post continues to
> serve as our Chief Executive Officer and a director.
>
> Jeffrey K. Storey, age 57, was appointed to serve as President and
> Chief Operating Officer of CenturyLink (and, as noted below, one
> of our directors) effective upon the Closing. As previously
> announced, we currently anticipate that Mr. Storey would succeed
> Mr. Post as our Chief Executive Officer on January 1, 2019, at which
> time Mr. Post would become executive chairman of our board of
> directors.
>
>                    *       *       *
>
> Appointment of New Directors. Effective upon the Closing, we
> expanded the size of our Board of Directors from 9 to 13 members.
> At such time, pursuant to the Merger Agreement, our Board
> appointed the individuals set forth below (each of whom served as a
> director of Level 3 prior to the Closing) to the Board and to the
> respective committees thereof specified below:

| Name | Committee(s) |
|---|---|
| Kevin P. Chilton | Audit; Risk Evaluation |
| Steven T. Clontz | Nominating and Governance |
| T. Michael Glenn | Human Resources and Compensation |
| Jeffrey K. Storey | --- |

\* \* \*

Retirement of Certain Officers of CenturyLink. Effective at the Closing, R. Stewart Ewing, Jr., who previously served as our Executive Vice President and Chief Financial Officer, and Dean J. Douglas, who previously served as President – Enterprise Markets, each stepped down from all executive positions with CenturyLink and its subsidiaries. Mr. Ewing's retirement will be effective after a short transition period, and Mr. Douglas' retirement was effective immediately.

In connection with Mr. Ewing's retirement, our Human Resources and Compensation Committee approved a discretionary increase in the amount of cash severance due to him under our Executive Severance Plan, from 52 weeks of pay to 104 weeks of pay, resulting in an additional $1,399,158 due to him. In addition, the Committee awarded Mr. Ewing a special discretionary cash bonus of $1,000,000 based on its assessment of his performance related to merger integration activities over the past year. The Committee also approved certain changes to his outstanding equity awards. Specifically, the Committee accelerated vesting of all 46,157 of Mr. Ewing's outstanding shares of time-based restricted stock effective at Closing. With respect to his 97,304 outstanding shares of performance-based restricted stock, Mr. Ewing will continue to hold those awards subject to their original performance conditions. In connection with approving this supplemental compensation, the Committee considered a range of factors, including Mr. Ewing's contributions to the growth of CenturyLink over the past 34 years and the critical role he played in connection with negotiating, financing and implementing the Acquisition.

237.    On December 7, 2017, the Company issued a press release and filed a current report on Form 8-K with the SEC announcing the conclusions and key findings of the special committee of independent board members. The press release stated, in relevant part:

MONROE, La. – Dec. 7, 2017 – CenturyLink, Inc. (the "Company") today announced that a Special Committee of independent board members has reported the findings of its previously announced review of the Company's policies procedures and practices relating to consumer sales, service and billing. The Company's outside directors promptly and voluntarily formed the Special Committee after a former employee alleged that the Company engaged in sales related misconduct, including charging customers for services they did not order— a practice known as "cramming." Over the past six

months, the Special Committee, together with independent counsel from O'Melveny & Myers LLP and forensic data analysts, collected and searched more than 9.7 million documents as well as 4.3 terabytes of billing data consisting of over 32 billion billing records; they also interviewed more than 200 current and former Company employees.

The Company's management cooperated fully with the Special Committee during this review.

The Special Committee's key findings:

- The investigation did not reveal evidence to conclude that any member of the Company's management team engaged in fraud or wrongdoing.
- Company management did not condone or encourage cramming, and the evidence did not show that cramming was common at the Company. The Company maintains specific policies and procedures that prohibit and are designed to prevent and deter cramming. When instances of cramming were found to have occurred, the Company took reasonable actions to discipline employees. However, the Company's investment in consumer sales monitoring was not sufficiently effective in proactively detecting and quantifying potential cramming.
- Some of the Company's products, pricing and promotions were complex and caused confusion, and the resulting bills sometimes failed to meet customer expectations. Additionally, limitations in the Company's ordering and billing software made it difficult to provide customers with estimates of their bills and confirmation of service letters that reflected all discounts, prorated charges, taxes and fees.
- Systems and human errors led to certain customers not receiving an offered point-of-sale discount. The Company did not fully address this issue in a timely manner for some customers.

In commenting on the Special Committee's investigation, CenturyLink CEO Glen Post stated, "The Company accepts the Special Committee's findings and conclusions. The investigation confirmed my long-held belief that there was no fraud or wrongdoing at the Company and that cramming was neither widespread nor condoned. However, we know there have been times when we haven't provided our customers the experience they deserve. We have identified a number of areas where we can improve the customer experience and have already made significant

progress in addressing those areas."

Mr. Post concluded, "We remain committed to maintaining an ethical business culture based on our Unifying Principles—fairness, honesty and integrity, commitment to excellence, positive attitude, respect, faith and perseverance. Those principles are at the core of who we are as a company and we want our customers to feel that in every interaction with us."

238.    On February 15, 2018, a consolidated class action complaint was filed in the Consolidated Action, including detailed allegations based on facts provided by thousands of customers, regarding CenturyLink's aggressive sales practices that encouraged and rewarded deceptive and unlawful conduct.

239.    On March 6, 2018, the Company issued a press release announcing that the Company's CEO, Defendant Post, would be retiring in May, effective the date of the Company's annual meeting, and that Defendant Storey will assume the role as CEO on that date. Previously, Defendant Post had stated that he would remain as CEO until January 1, 2019.  In connection with Post's retirement, he stands to receive, upon retirement, (i) vesting of half of his 2018 time-vested restricted shares; (ii) retention of half of his 2018 performance-based restricted shares subject to their original performance conditions; (iii) vesting of the equity portion of his 2017 special integration award at a 100% payout rate; and (iv) full vesting of all time-vested restricted shares granted to him before 2018 and to retain, subject to their original performance conditions, all performance-based restricted shares granted to him before 2018.

240.    In the same press release, the Company announced that Defendant Perry will remain in his role as Chairman of the Board.

**INSIDER SELLING**

241.    During the Relevant Period, while in possession of material, adverse, non-public information, certain of the Individual Defendants took advantage of the artificially inflated prices

to sell their CenturyLink shares for substantial proceeds. Specifically, as detailed below, the

242.    Insider Selling Defendants (Ewing, Cole, Boulet, Brown, Perry, and Siegel) collectively sold more than $5.6 million of personally held CenturyLink common stock.

243.    Defendant Ewing was the Company's CFO during the Relevant Period. Ewing was aware of material, non-public information regarding the Company's financial reporting, and the inaccuracy of CenturyLink's disclosures in the Company's press releases and public filings, including that CenturyLink's revenues were inflated and unsustainable. While in possession of this information, Ewing sold at least 65,600 personally held shares of CenturyLink stock at artificially inflated prices for proceeds of more than $2.6 million. Ewing's sales were timed to maximize profits from the Company's then artificially inflated stock price.

244.    Defendant Cole was the Company's CAO and Controller during the Relevant Period. Cole was aware of material, non-public information regarding the Company's financial reporting, and the inaccuracy of CenturyLink's disclosures in the Company's press releases and public filings, including that CenturyLink's revenues were inflated and unsustainable. While in possession of this information, Cole sold at least 37,525 personally held shares of CenturyLink stock at artificially inflated prices for proceeds of more than $1.29 million. Cole's sales were timed to maximize profits from the Company's then artificially inflated stock price.

245.    Defendant Boulet was a member of the Company's Board during the Relevant Period. Boulet was aware of material, non-public information regarding the Company's financial reporting, and the inaccuracy of CenturyLink's disclosures in the Company's press releases and public filings, including that CenturyLink's revenues were inflated and unsustainable. While in possession of this information, Boulet sold at least 6,207 personally held shares of CenturyLink stock at artificially inflated prices for proceeds of approximately $211,634. Boulet's sales were

timed to maximize profits from the Company's then artificially inflated stock price.

246.   Defendant Brown was a member of the Company's Board during the Relevant Period. Brown was aware of material, non-public information regarding the Company's financial reporting, and the inaccuracy of CenturyLink's disclosures in the Company's press releases and public filings, including that CenturyLink's revenues were inflated and unsustainable. While in possession of this information, Brown sold at least 12,724 personally held shares of CenturyLink stock at artificially inflated prices for proceeds of approximately $389,991. Brown's sales were timed to maximize profits from the Company's then artificially inflated stock price.

247.   Defendant Perry was the Chairman of the Board during the Relevant Period. Perry was aware of material, non-public information regarding the Company's financial reporting, and the inaccuracy of CenturyLink's disclosures in the Company's press releases and public filings, including that CenturyLink's revenues were inflated and unsustainable. While in possession of this information, Perry sold at least 30,000 personally held shares of CenturyLink stock at artificially inflated prices for proceeds of approximately $945,000. Perry's sales were timed to maximize profits from the Company's then artificially inflated stock price.

248.   Defendant Siegel was a member of the Company's Board during the Relevant Period. Siegel was aware of material, non-public information regarding the Company's financial reporting, and the inaccuracy of CenturyLink's disclosures in the Company's press releases and public filings, including that CenturyLink's revenues were inflated and unsustainable. While in possession of this information, Siegel sold at least 4,983 personally held shares of CenturyLink stock at artificially inflated prices for proceeds of approximately $134,285s. Siegel's sales were timed to maximize profits from the Company's then artificially inflated stock price

249.   These insider sales were executed under highly suspicious circumstances and

occurred while the Company's stock price was artificially inflated due to the misrepresentations and omissions alleged herein. The Insider Selling Defendants' sales during the Relevant Period include the following:

| Name | Position | Date | Amount | Dollar | Total |
|---|---|---|---|---|---|
| Ewing, Jr. | CFO | 11/13/2014 | 5,000 | $40.38 | $201,917.50 |
| | | 11/12/2014 | 4,0000 | $41.05 | $1,642,132.00 |
| | | 05/12/2014 | 600 | $36.79 | $22,074.06 |
| | | 05/12/2014 | 20,000 | $36,74 | $734,946.00 |
| | | TOTAL | 65,600 | TOTAL | $2,601,069.56 |
| | | | | | |
| Cole | CAO | 10/27/2016 | 30,000 | $33.00 | $990,000.00 |
| | | 12/02/2014 | 7,525 | $41.05 | $308,938.12 |
| | | TOTAL | 37,525 | TOTAL | $1,298,938.12 |
| | | | | | |
| Boulet | Director | 03/06/2014 | 3,200 | $31.30 | $100,164.48 |
| | | 05/28/2013 | 3,007 | $37.07 | $111,469.49 |
| | | TOTAL | 6,207 | TOTAL | $211,633.97 |
| | | | | | |
| Brown | Director | 02/29/2016 | 12,724 | $30.65 | $389,990.60 |
| | | TOTAL | 12,724 | TOTAL | $389,990.60 |
| | | | | | |
| Perry | Chairman | 10/27/2016 | 5,000 | $32.00 | $160,000.00 |
| | | 10/27/2016 | 5,000 | $33.00 | $165,000.00 |
| | | 07/13/2016 | 20,000 | $31.00 | $620,000.00 |
| | | TOTAL | 30,000 | TOTAL | $945,000.00 |
| | | | | | |
| Siegel | Director | 12/09/2015 | 603 | $26.94 | $16,244.82 |
| | | 12/09/2015 | 4,380 | $26.95 | $118,041.00 |
| | | TOTAL | 4,983 | TOTAL | $134,285.82 |
| | | | | | |
| | | GRAND TOTAL | 157,039 | GRAND TOTAL | $5,580,918.07 |

## DERIVATIVE ALLEGATIONS

250.    Plaintiffs bring this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the breaches of fiduciary duties, waste of corporate assets, and unjust enrichment by Defendants.

251.    Plaintiffs will adequately and fairly represent the interests of CenturyLink in

enforcing and prosecuting its rights.

252.    Plaintiffs were shareholders of CenturyLink common stock at the time of the wrongdoing of which Plaintiffs complain and have been continuously since.

253.    Before filing this derivative action, Plaintiffs first demanded that the Board take action to investigate the misconduct alleged herein and, if warranted, to commence litigation against the Individual Defendants. Specifically, on September 28, 2017, in accordance with Louisiana law, Plaintiffs made a written demand on the Board to investigate and address the misconduct and, if warranted, to commence litigation against the Individual Defendants. A true and correct copy of Plaintiffs' demand letter is attached hereto as Exhibit A (the "Litigation Demand").

254.    In response to the Litigation Demand, Plaintiffs' counsel received a letter dated October 11, 2017 (the "October 11, 2017 Letter"), from Steven W. Usdin, who signed the October 11, 2017 Letter in his capacity as representative of the Special Litigation Committee ("SLC"). Mr. Usdin noted that the SLC had been appointed by the Board to investigate the Demand. The October 11, 2017 Letter further stated: "Because the SLC inquiry into the demands and allegations contained in the demands is ongoing, we request that you defer instituting any legal proceedings until the completion of that inquiry, which is being conducted as expeditiously as possible." The October 11, 2017 Letter also requested a response in writing advising whether Plaintiffs agreed to the request for deferral. A true and correct copy of the October 11, 2017 Letter is attached hereto as Exhibit B.

255.    On April 13, 2018, Plaintiffs' counsel received a letter (the "April 13, 2018 Letter") from Mr. Usdin, rejecting the Litigation Demand. A true and correct copy of the April 13, 2018 Letter is attached hereto as Exhibit C. The April 13, 2018 Letter stated the following:

As we communicated to you previously, the Board of Directors of CenturyLink, Inc. ("CenturyLink") appointed a Special Litigation Committee (the "SLC") to investigate the allegations and demands in your derivative-demand letter, and similar letters CenturyLink has received. The SLC was vested with the full authority of the Board to take any action that the SLC deemed to be in the best interest of the Company. As originally constituted, the SLC included Martha Bejar and Mike Roberts. Following the Level 3 acquisition, General Kevin Chilton was appointed to the SLC.

The SLC conducted an extensive investigation, lasting over seven months. The SLC reviewed, among other items: minutes and materials from the meetings of the CenturyLink Board of Directors as well as Director Committees, including the Audit Committee, the Risk Evaluation Committee, and the Compensation Committee, company policies and procedures, articles, bylaws, charters, directives, memoranda, handwritten notes, presentations, training materials, contracts, public filings, 10b5-1 plans, billing records, litigation documents, regulatory documents, customer complaints, e-mails and chat conversations. In addition to reviewing documents and data, the SLC interviewed 31 witnesses, including employees, former employees, Officers, and Directors. The SLC also consulted with independent experts and consultants.

The SLC met frequently with undersigned counsel to discuss the progress of the investigation as it developed, review the evidence, assess the credibility of witnesses, and determine what additional information and efforts might be necessary. The SLC met a total of 20 times, in addition to the interviews attended together and discussions surrounding same. The SLC members and counsel discussed the allegations in the derivative-demand letters at length and evaluated CenturyLink's best interest.

The SLC has carefully considered the demands made by you and by other shareholders. The SLC found no evidence to support the allegations made in the demand letters. The SLC also considered the institutional changes and advancements at CenturyLink as well as the pending litigation and other regulatory matters CenturyLink now faces. In light of all of the information and relevant considerations, and the legal standards set forth in La. R.S. 12:1-830 et seq. and La. R.S. 12:1-840 et seq., as well as other relevant statutes, the SLC has determined that it is not in the best interest of CenturyLink to pursue litigation against any Directors, Officers, or employees of the company, or to act on any of the demands made on the company. Accordingly, pursuant to La. R.S. 12:1-740 et seq., the SLC is rejecting your demand.

256.    On June 21, 2018, Plaintiffs' counsel sent Mr. Usdin a letter requesting the following:

We are in receipt of your April 13, 2018 letter.  Please provide us with all of the

items listed in your letter that the Special Litigation Committee ("SLC") reviewed. For example, according to the April 13, 2018 letter, the SLC reviewed: "minutes and materials from meetings of the CenturyLink Board of Directors as well as Director Committees, including Audit Committee, the Risk Evaluation Committee, and the Compensation Committee, company policies and procedures, articles, bylaws, charters, directives, memoranda, handwritten notes, presentations, training materials, contracts, public filings, 10b5-1 plans, billing records, litigation documents, regulatory documents, customers complaints, e-mails and chat conversations […] interviews [with] 31 witnesses, including employees, former employees, Officers, and Directors. . . ."

Please also provide us with (1) the names of the witnesses interviewed and any reports generated from those interviews and (2) the names of the experts and consultants used in the investigation and any reports generated from those experts and consultants. Moreover, please let us know if a report was issued by the Board and/or SLC regarding its investigation and if there is a report, we would request that you also produce that to us. Finally, we would be agreeable to entering into an appropriate confidentiality agreement.

*See* Exhibit D attached hereto.

257.    On June 25, 2018, Mr. Usdin responded that he would not be producing any documents even though he offered to provide certain information in response from other shareholders' counsel, subject to a Confidentiality Agreement. Mr. Usdin further stated that "[b]ecause of the pendency of the litigation, we will not be providing any of the requested information, some of which we would otherwise have declined to produce anyway." *See* Exhibit E attached hereto.

258.    On June 25, 2018, Plaintiffs' counsel sent Mr. Usdin a letter that they would be willing to enter into a Confidentiality Agreement regarding the information and would hold the information confidential form the other shareholders who have filed derivative lawsuits. *See* Exhibit F attached hereto.

259.    The Board's refusal of Plaintiffs' Demand was both unreasonable and conclusory. The April 13, 2018 Letter fails to provide information regarding the scope of the investigation and does not explain what criteria were used to evaluate the Company's business practices, reporting,

procedures, oversight, and internal controls. Based on this refusal, it is impossible to evaluate

whether the SLC adequately investigated, as Plaintiffs demanded, whether the Company's officers

and directors breached their fiduciary duties to the Company by issuing or causing to issue false

and misleading statements on behalf of the Company. Plaintiffs' Demand specifically required an

independent internal investigation into wrongdoing allegations contained in the various class

actions that have been brought against the Company. The consolidated class action complaint in

the Consolidated Action was not filed until February 15, 2018, and there is no indication that the

investigation included any evaluation of those allegations. Accordingly, the SLC and the Board

did not act on the basis of all reasonably available information and ignored Plaintiffs' specific

demand to fully investigate the false and misleading statements alleged herein.

260.    Furthermore, the formation of the SLC taints its investigation. Initially, as reported

in the Company's August 7, 2017 10-Q filing, the Board formed a special committee in June of

2017 to investigate the acts underlying the Plaintiffs' Litigation Demand. As noted in the August

10-Q filing:

> In June 2017, a former employee filed an employment lawsuit against us claiming
> that she was wrongfully terminated for alleging that we charged some of our retail
> customers for products and services they did not authorize. Shortly thereafter, and
> based in part on the allegations made by the former employee, a series of consumer
> and shareholder putative class actions were filed against us and we received a
> shareholder derivative demand. The Minnesota Attorney General also filed a civil
> suit on behalf of Minnesota consumers alleging that we engaged in improper sales
> and billing practices. The filing of additional related lawsuits is possible. In late
> June 2017, the Board of Directors formed a special committee of outside directors
> to investigate alleged improper sales and billing practices and related matters. The
> special committee is in the early stages of its investigation.

261.    Then, in the November 9, 2017 Form 10-Q, the Company announced the SLC had

been formed in August of 2017. Specifically, the November Form 10-Q stated:

> In June 2017, a former employee filed an employment lawsuit against us claiming
> that she was wrongfully terminated for alleging that we charged some of our retail

customers for products and services they did not authorize. Starting shortly thereafter and continuing since then and based in part on the allegations made by the former employee, a series of consumer and shareholder putative class actions were filed against us, and we received several shareholder derivative demands. In July 2017, the Minnesota Attorney General also filed a civil suit on behalf of the Minnesota consumers alleging that we engaged in improper sales and billing practices. The filing of additional related lawsuits is possible. The consumer putative class actions have been transferred to the U.S. District Court for the District of Minnesota for coordinated and consolidated pretrial proceedings. The shareholder putative class actions have been consolidated into a single action that currently is pending in U.S. District Court for the Western District of Louisiana. In addition, a separate, related class action has been filed in U.S. District Court for the Southern District of New York purportedly on behalf of persons who purchased certain of our Senior Notes. In late June 2017, the Board of Directors formed a special committee of outside directors to investigate improper sales and billing practices and related matters. In August 2017, the Board of Directors formed a special litigation committee of outside directors to address the allegations of impropriety contained in the shareholder derivative demands. Both investigations are ongoing.

262.    It is Plaintiffs' believe that the SLC's investigation was merely a continuation of and tainted by the original special committee's investigation. In fact, it is Plaintiffs' belief that the original special committee and the SLC were both initially comprised solely of Defendants Bejar and Roberts. Furthermore, Defendant Chilton was not added to the SLC until November of 2017 approximately three months after the formation of the SLC and approximately five months after the formation of the special committee. Thus, the "SLC investigation" was not even completely undertaken by those directors purportedly comprising the SLC. The April 13, 2018 Letter also lacks key information regarding the SLC's process, reasoning, and conclusions in conducting its investigation. For example, the April 13, 2018 Letter states that the SLC interviewed 31 witnesses but does not identify those witnesses or provide information regarding the scope of the interviews. The April 13, 2018 Letter also fails to provide a full written report by the SLC regarding its findings, witness summaries, or any detailed information regarding the specific documents reviewed by the SLC.

263.    Further, while the April 13, 2018 Letter states that "the SLC has determined that it is not in the best interest of CenturyLink to pursue litigation against any Directors, Officers, or employees of the company", the letter fails to weigh the potential recovery from any lawsuit in a way that would allow the Board to compare a lawsuit to the costs, and fails to consider the specific merits of bringing suit against any of the individual officers and directors identified in Plaintiffs' Demand.

264.    The limited nature of the SLC's investigation is unsurprising in light of the bias of the Defendants leading it: Defendants Bejar, Chilton, and Roberts. Defendants Bejar and Roberts were identified in Plaintiffs' Litigation Demand as directors that appeared to have breached their fiduciary duties to the Company by issuing false and misleading statements on behalf of the Company and/or completely failing to discharge their designated duties and responsibilities. Indeed, Defendants Bejar and Roberts signed the Company's annual Form 10-Ks filed with the SEC which, as alleged herein, contained materially false or misleading information regarding the quality and effectiveness of the Company's internal controls and the completeness of the Company's disclosures.

265.    In addition, Defendants Bejar and Chilton were both members of the Company's Audit Committee. The Company's Audit Committee is charged with reviewing the Company's financial statements, as well as monitoring the adequacy of the Company's internal controls. As such, as members of the Audit Committee, Defendants Bejar and Chilton must have known, or were reckless in not knowing, that the Company's public statements were false and misleading, and that the Company's internal controls were inadequate, and were therefore incapable of conducting a disinterested investigation into Plaintiffs' Demand.

266.    The Board's actions in response to Plaintiffs' Demand demonstrate the Board's

desire to achieve a predetermined result—a refusal of the demand. The Board deferred the investigation of Plaintiffs' Demand to conflicted SLC members who had personal interests in making the recommendation the Board wanted—a refusal of the Demand. The SLC failed to act independently in determining that the Plaintiffs' Demand should be rejected. The SLC was comprised of some of the same individuals that were implicated in the wrongdoing: Defendants Bejar and Roberts reviewed, approved, and/or signed statements that contained the improper representations alleged herein.

267.    Similarly, the directors who ultimately rejected Plaintiffs' Demand are also implicated in the wrongdoing complained of herein for their role in allowing misleading statements and filings to be issued and disseminated, and by allowing omissions to remain undisclosed, as alleged herein. At the time this action was commenced, the Board of CenturyLink consisted of the following thirteen (13) directors: Post, Storey, Bejar, Boulet, Brown, Chilton, Clontz, Glenn, Hanks, Landrieu, Perry, Roberts, and Siegel. The Director Defendants face a substantial likelihood of liability for their individual misconduct. The Director Defendants were directors during the Relevant Period, and as such had a fiduciary duty to ensure that the Company's SEC filings, press releases, and other public statements and presentations on behalf of the Company concerning its financial and business prospects were accurate.

268.    The Board's refusal of the Demand is unreasonable and the Individual Defendants have failed to conduct a reasonable inquiry and failed to act in good faith, on an informed basis, or in the honest belief that the refusal was in the best interest of the Company. Therefore, Plaintiffs reasonably believe that the Board's refusal is not a valid exercise of business judgment.

269.    CenturyLink has been and will continue to be exposed to significant losses due to the Individual Defendants' wrongdoing. Yet, the Director Defendants have not filed any lawsuits

against any persons who were responsible for the wrongful conduct. Thus, the Director Defendants continue to breach their fiduciary duties to the Company and face a sufficiently substantial likelihood of liability for their breaches.

## CAUSES OF ACTION

### COUNT I

### (Against Defendants for Breach of Fiduciary Duties)

270.    Plaintiffs incorporate by reference and re-allege each and every allegation contained above, as though fully set forth herein.

271.    Defendants owe the Company fiduciary obligations. By reason of their fiduciary relationships, Defendants owed and owe the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

272.    Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, and good faith.

273.    Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties. In breach of their fiduciary duties owed to CenturyLink, Defendants caused the Company to make false and/or misleading statements and/or failed to disclose that: (i) CenturyLink's policies allowed its employees to add services or lines to accounts without customer permission, resulting in millions of dollars in unauthorized charges to CenturyLink customers; (ii) accordingly, the Company's revenues were the product of illicit conduct and unsustainable; (iii) the foregoing illicit conduct was likely to subject CenturyLink to heightened regulatory scrutiny; and (iv) as a result of the foregoing, CenturyLink's public statements were materially false and misleading at all relevant times.

274.    Defendants had actual or constructive knowledge of the weaknesses of the

107

Company's internal controls and that the Company was involved in fraudulent practices. Defendants had actual knowledge of the above misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them.

275.    As a direct and proximate result of Defendants' failure to perform their fiduciary obligations, the Company has sustained significant damages.  As a result of the misconduct alleged herein, Defendants are liable to the Company.

276.    As a direct and proximate result of Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill. Such damage includes, among other things, costs associated with defending securities lawsuits, severe damage to the share price of the Company, resulting in an increased cost of capital, the waste of corporate assets, and reputational harm.

## COUNT II

### (Against Defendants for Waste of Corporate Assets)

277.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

278.    As a result of the wrongdoing detailed herein and by failing to conduct proper supervision, Defendants have caused the Company to waste its assets by paying improper compensation and bonuses to certain of its executive officers and directors that breached their fiduciary duty.

279.    As a result of the waste of corporate assets, Defendants are liable to the Company.

280.    Plaintiffs, on behalf of the Company, have no adequate remedy at law.

## COUNT III

CASE 0:18-cv-02835-MJD-JFD    Doc. 1    Filed 07/03/18    Page 109 of 111

**(Against Defendants for Unjust Enrichment)**

281.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

282.    By their wrongful acts and omissions, Defendants were unjustly enriched at the expense of and to the detriment of the Company.  Defendants were unjustly enriched as a result of the compensation and director remuneration they received while breaching fiduciary duties owed to the Company.

283.    Plaintiffs, as stockholders and representatives of the Company, seek restitution from Defendants, and each of them, and seek an order of this Court disgorging all profits, benefits, and other compensation obtained by Defendants, and each of them, from their wrongful conduct and fiduciary breaches.

284.    Plaintiffs, on behalf of the Company, have no adequate remedy at law.

## COUNT IV

### Against Defendants Ewing, Cole, Boulet, Brown, Perry and Seigel for Insider Selling and Misappropriation of Information

285.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

286.    At the time each of the Insider Selling Defendants sold his or her CenturyLink stock, he or she knew the material, non-public information described above, and sold CenturyLink stock on the basis of such information.

287.    The information described above was proprietary, non-public information concerning the Company's business operations, financial condition, and growth prospects. It was a proprietary asset belonging to the Company, which each of the Insider Selling Defendants misappropriated to his or her own benefit when he or she sold personal holdings in CenturyLink

109

stock. Each of the Insider Selling Defendants knew that this information was not intended to be available to the public. Had such information been generally available to the public, it would have significantly reduced the market price of CenturyLink stock.

288.    The Insider Defendants' sale of stock while in possession and control of this material, adverse, non-public information was a breach of his or her fiduciary duties of loyalty and good faith. Each of the Insider Selling Defendants is therefore liable to CenturyLink for insider trading.

289.    Since the use of the Company's proprietary information for personal gain constituted a breach of the fiduciary duties of the Insider Selling Defendants, the Company is entitled to the imposition of a constructive trust on any profits such Insider Selling Defendants obtained thereby.

290.    Plaintiffs, on behalf of CenturyLink, have no adequate remedy at law.

## REQUEST FOR RELIEF

**WHEREFORE**, Plaintiffs demand judgment as follows:

A.    Determining that this action is a proper derivative action maintainable under law, and that demand is excused;

B.    Awarding, against all Defendants and in favor of the Company, the damages sustained by the Company as a result of Defendants' breaches of their fiduciary duties;

C.    Directing the Company to take all necessary actions to reform and improve its corporate governance and internal procedures, to comply with the Company's existing governance obligations and all applicable laws and to protect the Company and its investors from a recurrence of the damaging events described herein;

D.      Awarding to Plaintiffs the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.      Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury.

DATED: July 3, 2018

PENDLEY, BAUDIN & COFFIN


By: */s/ Patrick W. Pendley*
      Patrick W. Pendley
P.O. Drawer 71
24110 Eden Street
Plaquemine, LA 70765
Telephone: (888) 725-2477
Facsimile: (225) 687-6398
Email: pwpendley@pbclawfirm.com

GAINEY McKENNA & EGLESTON
Thomas J. McKenna
Gregory M. Egleston
440 Park Avenue South
New York, NY 10016
Telephone: (212) 983-1300
Facsimile: (212) 983-0383
Email: tjmckenna@gme-law.com
Email: egleston@gme-law.com

*Attorneys for Plaintiffs*